1   THE O'MARA LAW FIRM, P.C.
    DAVID C. O'MARA
2   NEVADA BAR NO. 8599
3   311 East Liberty St.
    Reno, Nevada 89501
4   (775) 323-1321
    (775) 323-4082 (fax)
5
6   JOSHUA L. SEIFERT PLLC
    Joshua L. Seifert, Esq.
7   *Pro Hac Vice*
    jseifert@seifertpllc.com
8   175 Varick Street
    New York, NY 10014
9   (646) 823-9786

10  SLARSKEY LLC
11  David Slarskey, Esq.
    *Pro Hac Vice*
12  dslarskey@slarskey.com
    800 Third Avenue, 18th Floor
13  New York, NY 10022
    (212) 658-0661
14
15  *Counsel for Plaintiffs*

16              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA
17

18  ADDISON HEMPEL, CASSIDY
    HEMPEL, CHRISTINE HEMPEL, HUGH
19  HEMPEL, and SOLUTION
    THERAPEUTICS,                          Case No. 3:18-cv-00008-MMD-VPC
20
            Plaintiffs,
21                                          **MEMORANDUM OF POINTS AND
    v.                                      AUTHORITIES IN OPPOSITION TO
22                                          DEFENDANTS' CONSOLIDATED
    CYDAN DEVELOPMENT, INC.,                MOTION TO DISMISS FOR FAILURE
23  CYDAN II, INC., VTESSE, INC.,           TO STATE A CLAIM AND LACK OF
    SUCAMPO PHARMACEUTICALS,                FEDERAL SUBJECT MATTER
24  INC., and DOES I-X and ROE              JURISDICTION**
    CORPORATIONS I-V, inclusive,
25
            Defendants.
26
27
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................. 2

A.   The Hempels Are the First in the World to Develop
     a Cyclodextrin Protocol to Treat NPC in Human Beings .................................... 2

B.   Cydan Misappropriates the Hempels' Protected Material for Vtesse ................... 4

C.   NIH-Funded Researchers Misappropriate the Hempels' Data for Vtesse ............ 5

D.   Sucampo Acquires Vtesse for $200 Million and Subsumes Its Operations ......... 7

ARGUMENT .................................................................................................................. 7

I.    THE HEMPELS HAVE STATED A CLAIM FOR BREACH OF CONTRACT ............ 8

      A.   The Hempels Have Alleged Enforceable Contracts with Cydan ................... 8

           1.   The Confidentiality Agreement is Enforceable ................................... 8

           2.   An Implied Contract Governed Use of the Business Plan .................... 9

      B.   The Complaint Alleges Cydan and Vtesse Breached those Contracts ......... 10

      C.   Vtesse is Bound by Cydan's Contracts with the Hempels .......................... 12

II.   THE HEMPELS HAVE STATED A CLAIM FOR MISAPPROPRIATION ............... 12

      A.   The Hempels' Disclosed Trade Secrets to Cydan ...................................... 13

      B.   Cydan Had a Duty of Non-Use and Non-Disclosure .................................. 15

      C.   Cydan Used and Disclosed the Hempels' Trade Secrets ............................. 16

      D.   Vtesse and Sucampo are Liable for Misappropriation ................................ 16

           1.   Vtesse and Sucampo Knew or Should Have Known
                They Were Benefitting from Cydan's Misappropriation ..................... 17

           2.   Vtesse Is Liable for Its Own Acts of Misappropriation ...................... 18

III.  THE HEMPELS' COMMON LAW CLAIMS ARE NOT
      PREEMPTED AND ARE ADEQUATLEY PLEADED ............................................ 18

      A.   The Hempels' Claims Are Not Preempted by NUTSA ............................... 18

      B.   The Hempels Have Stated Common Law Claims ....................................... 19

           1.   The Hempels Have Stated a Claim for Breach of Fiduciary Duty ...... 19

i

2. The Hempels Have Stated a Claim for Unjust Enrichment ...................... 20

3. The Hempels Have Stated a Claim for Tortious Interference .................. 22

4. The Hempels Have Stated a Claim for Conversion ................................. 22

5. The Hempels Have Stated a Claim for Civil Conspiracy ......................... 23

IV.   SUCAMPO AND CYDAN II ARE ALSO LIABLE ON
GROUNDS OF VICARIOUS OR SUCCESSOR LIABILITY ....................................... 23

V.   THE COURT HAS SUBJECT MATTER JURISDICTION ........................................... 24

CONCLUSION ......................................................................................................................... 24

ii

# TABLE OF AUTHORITIES

## CASES

*A. L. Laboratories Inc. v. Philips Roxane, Inc.,*
803 F.2d 378 (8th Cir. 1986)..................................................................15

*Allied Erecting & Dismantling Co. v. Genesis Equipment & Manufacturing,*
649 F. Supp. 2d 702 (N.D. Ohio 2009) ...................................... 14, 15

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) .............................................7

*Bader v. Cerri,* 96 Nev. 352 (1980).....................................................22

*Bartech Systems International, Inc. v. Mobile Simple Solutions, Inc.,*
No. 2:15-cv-02422-MMD-NJK, 2016 U.S. Dist. LEXIS 68030
(D. Nev. May 24, 2016).......................................................................12

*Bates v. Cottonwood Cove Corp.,*
84 Nev. 388 (1968)..............................................................................17

*Bergman v. Electrolux Corp.,*
558 F. Supp. 1351 (D. Nev. 1983) ................................................9, 10

*Capital Asset Research Corp. v. Finnegan,*
160 F.3d 683 (11th Cir. 1998)...........................................................14

*Cave Consulting Group, Inc. v. Truven Health Analytics Inc.,*
No. 15-cv-02177-SI, 2017 U.S. Dist. LEXIS 62109 (N.D. Cal. Apr. 24, 2017).............24

*Chartrand v. Barney's Club, Inc.,*
380 F.2d 97 (9th Cir. 1967) ..................................................................9

*Colgate-Palmolive Co. v. Carter Products, Inc.,*
230 F.2d 855 (4th Cir. 1956)...............................................................18

*Commonwealth Land Title Insurance Co. v. Iota Indigo, LLC,*
No. 2:13-cv-01837-MMD-PAL, 2014 U.S. Dist. LEXIS 5912
(D. Nev. Jan. 14, 2014).........................................................................9

*Custom Teleconnect, Inc. v. International Tele-Services, Inc.,*
254 F. Supp. 2d 1173 (D. Nev. 2003) ...............................................19

*Davis Wine Co. v. Vina Y Bodega Estampa, S.A.,*
823 F. Supp. 1159 (D. Or. 2011)...........................................................8

*Desio v. Russell Road Food & Beverage, LLC,*
No. 2:15-cv-01440, 2016 U.S. Dist. LEXIS 123077 (D. Nev. Sept. 9, 2016)..................11

iii

*Fifty Associates v. Prudential Insurance Company of America*,
    446 F.2d 1187 (9th Cir. 1970)..................................................................................24

*Frantz v. Johnson*,
    116 Nev. 455 (2000)..........................................................................................13

*Fuhu, Inc. v. Toys "R" Us, Inc.*,
    No. 12cv2308-WQH-WVG, 2013 U.S. Dist. LEXIS 196563
    (S.D. Cal. Mar. 1, 2013) ...................................................................................13

*GES, Inc. v. Corbitt*,
    117 Nev. 265 (2001).........................................................................................23

*Gilead Sciences, Inc. v. Abbott Laboratories, Inc.*,
    Civil Action No. 13-2034-GMS, 2015 U.S. Dist. LEXIS 31006
    (D. Del. Mar. 13, 2015) ...................................................................................10

*Global Advanced Metals USA, Inc. v. Kemet Blue Powder Corp.*,
    No. 3:11-cv-00793, 2012 U.S. Dist. LEXIS 126550 (D. Nev. Sept. 6, 2012).................13

*Hoppe v. Percheron Associates, LLC*,
    No. 11-cv-03233-CBS, 2012 U.S. Dist. LEXIS 107149
    (D. Colo. Aug. 1, 2012) .....................................................................................8

*J.J. Industries, LLC v. Bennett*,
    119 Nev. 269 (2003).........................................................................................22

*Jacobson v. Stern*,
    96 Nev. 56 (1980)...............................................................................................8

*Johnson v. City of Shelby*,
    135 S. Ct. 346 (2014).........................................................................................7

*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.*,
    90 Cal. Rptr. 3d 247 (Cal. Ct. App. 2009).........................................................18

*Kewanne v. Bicron*,
    416 U.S. 470 (1974) .........................................................................................16

*Las Vegas Machine & Engineering Works, Inc. v. Roemisch*,
    67 Nev. 1 (1950)...............................................................................................19

*LeasePartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*,
    113 Nev. 747 (1997).........................................................................................20

*M.C. Multi-Family Development, LLC v. Crestdale Associates, Ltd.*,
    124 Nev. 901 (2008).....................................................................................22, 23

iv

*Momot v. Mastro*,
    No. 2:09-cv-00975-RLH-LRL, 2011 U.S. Dist. LEXIS 51747
    (D. Nev. May 12, 2011)................................................................................................21

*Montgomery v. Etreppid Technologies, LLC*,
    Nos. 3:06-CV-00056-PMP-VPC, 3:06-CV-00145-PMP-VPC,
    2008 U.S. Dist. LEXIS 28118 (D. Nev. Apr. 7, 2008)....................................................19

*New England Life Insurance Co. v. Lee*,
    No. 2:14-CV-1797 JCM (NJK), 2015 U.S. Dist. LEXIS 39462
    (D. Nev. Mar. 27, 2015) ...............................................................................................17

*Nichols v. Findlay Automotive Group, Inc.*,
    No. 2:12-cv-00093-MMD-VCF, 2013 U.S. Dist. LEXIS 25960
    (D. Nev. Feb. 26, 2013) ..........................................................................................19, 20

*NL Industries, Inc. v. Kaplan*,
    792 F.2d 896 (9th Cir. 1986)...........................................................................................7

*On Demand Direct Response, LLC v. McCart-Pollak*,
    No. 2:15-cv-01576-MMD-NJK, 2017 U.S. Dist. LEXIS 123780
    (D. Nev. Aug. 4, 2017) ............................................................................................10, 21

*Orthofix Inc. v. Gordon*,
    No. 1:13-cv-01463-SLD-TSH, 2016 U.S. Dist. LEXIS 38852
    (C.D. Ill. Mar. 24, 2016)...............................................................................................12

*Philips International Investments, LLC. v. Pektor*,
    117 A.D.3d 1 (N.Y. 1st Dep't. 2014) .............................................................................21

*Phillips v. Frey*,
    20 F.3d 623 (5th Cir. 1994) ..........................................................................................15

*PMC, Inc. v. Kadisha*,
    93 Cal. Rptr. 2d 663 (Cal. Ct. App. 2000) .....................................................................17

*Riddle v. Simmons*,
    922 So. 2d 1267 (La. App. Ct. 2006) ............................................................................19

*Seibold v. Camulos Partners LP*,
    No. Civ.A.5176, 2012 Del. Ch. LEXIS 216 (Del. Ch. Sept. 17, 2012)............................17

*SleekEZ, LLC v. Horton*,
    No. CV 16-09-BLG-SPW-TJC, 2018 U.S. Dist. LEXIS 33858
    (D. Mont. Jan. 8, 2018)................................................................................................16

*Space Data Corp. v. X*,
    No. 16-cv-03260, 2017 U.S. Dist. LEXIS 22571 (N.D. Cal. Feb. 16, 2017)...................16

v

*SVI, Inc. v. Supreme Corp.*,
    No. 2:16-cv-01098-JAD-NJK, 2017 U.S. Dist. LEXIS 81983
    (D. Nev. May 30, 2017)...........................................................................................18, 19

*T Street Development, L.L.C. v. Dereje*,
    Civ. Action No. 05-524 (GK), 2005 U.S. Dist. LEXIS 38713
    (D.D.C. Dec. 19, 2005)..................................................................................................8

*Topaz Mut. Co. v. Marsh*,
    108 Nev. 845 (1992)................................................................................................20, 21

*US Bank, N.A. v. Recovery Services Northwest, Inc.*,
    Case No. 2:13-cv-01254-APG-GWF, 2014 U.S. Dist. LEXIS 47172
    (D. Nev. Apr. 4. 2014)..................................................................................................11

*USACM Liquidating Trust v. Deloitte & Touche LLP*,
    764 F. Supp. 2d 1210 (D. Nev. 2011) ..........................................................................17

*V'Guara Inc. v. Dec*,
    925 F. Supp. 2d 1120 (D. Nev. 2013) .....................................................................14, 15

**STATUTES**

18 U.S.C. § 1832................................................................................................................24

Nevada Revised Statutes § 600A.030 ..........................................................................13, 15

Nevada Revised Statutes § 600A.032 ...............................................................................14

Nevada Revised Statutes § 600A.090 ...............................................................................18

Nevada Revised Statutes §§ 600A.010-.100 .....................................................................13

**RULES**

Federal Rule of Civil Procedure 8 ..............................................................................7, 19

**TREATISES**

12 S. Williston, *Contracts* §35:71 (4th Ed. Lord 1999)................................................8

18 American Jurisprudence 2d Corporations §136 (2011) ...........................................8

William Meade Fletcher *et al.*, *Fletcher Cyclopedia of the Law of Private
    Corporations* (Perm. Ed. 2010)...............................................................................9, 17

2-7 Milgrim on Trade Secrets § 7.02[2][c] ..................................................................17

46 American Jurisprudence 2d Joint Ventures § 34 ...................................................19

vi

Restatement (Second) of Torts § 8A (2nd 1979)..........................................................................23

Restatement (Third) of Agency § 6.04 (2006) ...............................................................................9

Restatement (Third) of Unfair Competition § 39 (3rd 1995)................................................. 13, 14

Restatement (Third) of Unfair Competition § 41 (3rd 1995)...................................................9, 15

## REGULATIONS

21 C.F.R. § 312.23 .......................................................................................................................6

1      Plaintiffs Addison, Cassidy, Christine, and Hugh Hempel and Solution Therapeutics

2 ("Plaintiffs" or the "Hempels") submit this Memorandum of Points and Authorities in Opposition

3 to the Consolidated Motion to Dismiss for Failure to State a Claim and Lack of Subject Matter

4 Jurisdiction by Defendants Cydan Development, Inc. ("Cydan")[1], Cydan II, Inc., Vtesse, Inc., and

5 Sucampo Pharmaceuticals, Inc, ECF No. 12 ("DM").

6                       **PRELIMINARY STATEMENT**

7      Defendants' motion should be denied. The Hempels pioneered the development of cy-

8 clodextrin to treat Niemann Pick Disease, Type C ("NPC")—an ultra-rare, degenerative, and fatal

9 disease that afflicts the Hempel Twins. The Hempels took extraordinary personal risks, invested

10 millions of dollars and years of effort developing cyclodextrin, and successfully obtained unprec-

11 edented FDA approvals in 2009 and 2010. In 2013, as word of the Hempels' success spread,

12 Cydan—a venture capital firm—became interested in their work. Cydan deliberately fostered and

13 abused a relationship of trust with the Hempels: it gained access to their confidential information

14 and trade secrets (the "Protected Material"), broke its promises of confidentiality and non-use,

15 usurped the Hempels' commercial opportunity, formed Vtesse in the image of the Hempels' pro-

16 posal, and sold Vtesse's cyclodextrin asset (VTS-270) for $200 million. On these facts, the Com-

17 plaint states claims for, *inter alia*, breach of contract, misappropriation of trade secrets, and breach

18 of fiduciary duty.

19      Defendants move to dismiss the Complaint with a raft of objections that overlook the alle-

20 gations and misapprehend controlling law:

21      *First*, the Hempels have enforceable contracts with Defendants. A corporate promoter has

22 the power to enforce pre-incorporation contracts, even if the proposed corporation never comes

23 into being. The Hempels entered into express and implied contracts with Cydan on behalf of So-

24 lution Therapeutics, a wholly-owned company they never incorporated. And the Hempels con-

25 ferred the benefits of those contracts on Cydan and Vtesse. Accordingly, the Hempels have the

26

_____

27 [1] Unless otherwise stated, capitalized terms have the same definition as in the Complaint.

28                       1

1 power to enforce those contracts and hold Defendants liable for their breach.

2     *Second*, the Hempels have alleged breaches of contract, misappropriation, and breaches of

3 fiduciary duty. To gain access to the Hempels' Protected Material, Defendants promised not to use

4 the information for any purpose, except to consider a business relationship with the Hempels. In-

5 stead, Defendants reviewed everything the Hempels had developed, collaborated with the Hempels

6 over six months to build a joint enterprise, and assured the Hempels that they were going forward

7 with the project. And then, in secret, Cydan used the Hempels' Protected Material to form Vtesse

8 and cut the Hempels out of the venture.

9     *Third*, Vtesse, Sucampo, and Cydan II are also liable for misappropriation and unjust en-

10 richment. Because Cydan's misappropriators sat on Vtesse's board of directors, Vtesse is imputed

11 with their knowledge and, thus, knowingly accepted the benefits of their misappropriation. More-

12 over, Vtesse and Sucampo received and used the Hempels' Protected Material, which they knew

13 or should have known was misappropriated. The Hempels' Protected Material were wholly-

14 unique, and related to an ultra-rare disease in a small medical research and development commu-

15 nity. Anyone who came to possess that data, particularly after doing diligence on a treatment the

16 Hempels had designed, would have known its source. Finally, Cydan II and Sucampo are liable as

17 successors-in-interest.

18     For these reasons, and those stated herein, Defendants' motion should be denied in its en-

19 tirety. If the Court grants any part of the motion, the Hempels request leave to amend the Complaint

20 to conform to their opposition filings, and cure any deficiencies identified by the Court.

21 **BACKGROUND**

22 **A.    The Hempels Are the First in the World to Develop**

23        **a Cyclodextrin Protocol to Treat NPC in Human Beings**

24     Addison and Cassidy Hempel are twins, born on January 23, 2004. *See* Compl., ECF Doc.

25 No. 1, ¶ 2. In 2007, the twins were diagnosed with NPC, an ultra-rare, degenerative neurological

26 disease. *Id.* There are approximately 100 known cases in the United States. NPC causes severe

27 disability, with symptoms akin to Alzheimer's disease, and premature death. *Id.*

28 2

1    In 2007, there was no approved treatment for NPC in the United States. Compl. ¶ 24. That
2    year, a research paper was published showing that cyclodextrin could be used to treat NPC-like
3    symptoms in mice. *Id.* ¶ 30. Upon learning of the publication, the Hempels both left their employ-
4    ment, and invested approximately $3 million of their personal time and money, along with millions
5    of dollars in donations they raised and *pro bono* work they elicited from world-class physicians,
6    to develop their own, privately-funded treatment for NPC using cyclodextrin. *Id.* ¶ 3. In 2009 and
7    2010, the United States Food and Drug Administration ("FDA") approved the Hempels' proposals
8    for the clinical use of cyclodextrin in treating their daughters. It was the first time the FDA had
9    approved the use of cyclodextrin in humans. *Id.* ¶ 4.

10    Initially, the Hempels explored three different drug delivery pathways for treating NPC
11    with cyclodextrin: intravenous injections (*i.e.,* bloodstream), intrathecal injections (*i.e.,* lower spi-
12    nal cord), and intracerebral injections (*i.e.* directly into the brain). Compl. ¶¶ 38-40. Ultimately,
13    the Hempels and their team of doctors, scientists, and advisors focused on intravenous and in-
14    trathecal cyclodextrin therapy, developing the first protocols for treating humans accordingly. *Id.*
15    ¶ 40. Between 2009 and 2013, the Hempels compiled a library of medical research and data evi-
16    dencing that bi-monthly intrathecal injections of cyclodextrin was the most effective method
17    known. *Id.* ¶ 42. The Hempels maintained the data in confidence, disclosing it only to the FDA
18    and to physicians and researchers who received the information under express and implied agree-
19    ments that the data would not be used for commercial purpose. *Id.* ¶¶ 80-81.

20    In 2011, the Hempels began developing a confidential business plan for an entity they re-
21    ferred to as Solution Therapeutics. Compl. ¶ 42; *see also* Decl. of Hugh Hempel ("Hempel Decl.")
22    Ex. 3 ("Business Plan"). The 43-page Business Plan detailed how the Hempels intended to com-
23    mercialize the cyclodextrin treatments they had developed, using the extensive and unique data set
24    they had compiled to validate the viability of the investment. Compl. ¶ 42. The Hempels planned
25    to obtain FDA marketing approval for cyclodextrin, which would grant them exclusive commer-
26    cialization rights. *Id.* ¶ 45. Moreover, because NPC is an ultra-rare pediatric disease, successful
27    development of a therapeutic drug was expected to result in a "Priority Review Voucher" from the

28    3

FDA, worth hundreds of millions of dollars. *Id.* ¶ 47. The Business Plan said the Hempels would split the proceeds of any commercialization 50/50 with their investors. *Id.* They intended to dedicate their share to fund a non-profit dedicated to benefiting NPC research and reducing patient costs. *Id.*; *see also* Business Plan at 4 (50/50 venture).

## B.   Cydan Misappropriates the Hempels' Protected Material for Vtesse

The Hempels and their efforts were well-known in the NPC community and their successes were widely reported. Compl. ¶¶ 4, 27. In late June 2013, Chris Adams, the then-Chief Business Officer of Cydan—a venture capital-backed drug development incubator—contacted Hugh Hempel to discuss an investment in the Hempels' efforts. *Id.* ¶ 43. After months of conversations, Adams invited Hugh to meet in person with Cydan to discuss a collaboration. *Id.* ¶ 45. In advance of the meeting, Hugh emailed Cydan a copy of the Business Plan, which was marked "Confidential." *Id.* ¶ 45. Christina Csimma, the then-CEO of Cydan, responded that "[t]he work you have done is truly amazing." *Id.* ¶ 48.

Hugh met with Cydan on September 13, 2013, for two hours to discuss their joint venture. *See* Compl. ¶ 49; Hempel Decl. ¶ 7. The next day, Deb Geraghty of Cydan requested a confidentiality agreement and access to the Hempels' medical data and research. Compl. ¶ 50. In response, Hugh sent a proposed "Agreement for Mutual Exchange of Confidential Information" between Solution Therapeutics, and Cydan. *Id.* ¶ 51; *see also* Hempel Decl. Ex. 5 (the "Confidentiality Agreement"). The Confidentiality Agreement prohibited Cydan from disclosing the Hempels' confidential information to any third-party or using it for any purpose other than consideration of a possible joint venture between the parties. Compl. ¶¶ 52-54; *see also* Confidentiality Agreement, Recitals. Csimma countersigned on behalf of Cydan. Compl. ¶¶ 48 & 56; *see also* Confidentiality Agreement 3.

Pursuant to the Confidentiality Agreement, and at Cydan's request, the Hempels disclosed to Cydan virtually everything they had developed over the previous five years regarding cyclodextrin and NPC. Compl. ¶ 57. They gave Cydan access to their password-protected library of confidential medical research, treatment results and their daughters' patient data, and their confidential

4

1  FDA submissions. *Id.* ¶¶ 59-64. And, at Cydan's request, they used their goodwill to facilitate
2  introductions between Cydan and NPC and NIH researchers. *Id.* ¶ 59.

3      For months thereafter, Hugh discussed and developed the intended joint venture with
4  Cydan. *Id.* ¶ 64. On January 16, 2014, Geraghty emailed the Hempels to say Cydan was moving
5  forward with the NPC project. *Id.* ¶ 65; Hempel Decl. ¶ 11 & Ex. 7. One month later, Adams and
6  Hugh had a call to discuss the next steps. Compl. ¶ 66.

7      Then, without explanation, Cydan broke off communications. Compl. ¶ 67. The Hempels
8  assumed Cydan had decided to abandon the project. *Id.* But they were wrong. Rather, Cydan went
9  forward with the project on its own and in secret. Without the Hempels' knowledge, in May 2014,
10 Cydan formed Vtesse, a company dedicated to commercializing an intrathecal cyclodextrin treat-
11 ment for NPC patients, known as VTS-270, with the goal of gaining marketing exclusivity and a
12 Priority Review Voucher, the identical treatment and business strategy proposed by the Hempels.
13 *Id.* ¶ 69. In other words, Cydan formed Vtesse in the image of Solution Therapeutics; Vtesse was
14 what Solution Therapeutics was supposed to be. Compl. ¶ 71.

15     Prior to Vtesse's launch, only the Hempels had collected substantial data regarding in-
16 trathecal cyclodextrin injections, and their Protected Material was the best evidence of the treat-
17 ment's efficacy and commercial viability. *Id.* That Protected Material was the foundation of the
18 Vtesse enterprise. Vtesse's scientific review board consisted of the same NPC and NIH researchers
19 identified in the Hempel's Business Plan, and to whom the Hempels had introduced Cydan. *Id* ¶¶
20 15 & 91. Csimma and Adams sat on Vtesse's board of directors. *Id.* ¶ 71.

21     **C.  NIH-Funded Researchers Misappropriate the Hempels' Data for Vtesse**

22     After its formation, Vtesse continued to misappropriate and use the Hempels' trade secrets,
23 including from NIH-funded researchers. In the years prior to Vtesse's formation, the Hempels had
24 selectively disclosed their Protected Material to specific researchers who wanted to treat specific
25 NPC patients. The Hempels disclosed that information with the express and implied understanding
26 that their Protected Material would only be used for ***medical, not commercial,*** purposes. *Id.* ¶ 91.
27 But Vtesse sought out those researchers, and offered to fund their research, so Vtesse could use

28                                         5

1   their results for commercial gain. *Id.* ¶¶ 75-91.

2          For example, in September 2013, the Hempels granted Dr. Elizabeth Berry-Kravis a right

3   of reference ("ROR")[2] to their confidential medical data in support of her application to the FDA,

4   so that she could treat two patients intrathecally with cyclodextrin. *Id.* ¶ 78. After gaining author-

5   ization from the Hempels to reference their data for medical purposes, Berry-Kravis modified her

6   study at Vtesse's request, so that Vtesse could use her results to support its competitive commercial

7   efforts. *Id.* ¶¶ 78-80. Vtesse rewarded Berry-Kravis's misappropriation by placing her on its sci-

8   entific board of review. *Id.* ¶ 91.

9          Vtesse also misappropriated the Hempels' data through the NIH-affiliated researchers it

10  captured. In December 2012, NIH researchers began a phase 1 trial of intracranial injections of

11  cyclodextrin in NPC patients. *See* Compl. ¶ 83. The Hempels gave the NIH an ROR to their data

12  for the trial because the NIH assured them in writing that its study would not compete with the

13  Hempels' intrathecal and intravenous cyclodextrin research and development efforts. *Id.* After

14  three participants in the NIH's trial suffered brain infections, the FDA shut it down in the spring

15  of 2013. *Id.* ¶ 84.

16         When the NIH failed, it sought to reconfigure its cyclodextrin studies. Compl. ¶ 85. In June

17  2013, the NIH-funded researchers discussed how to pivot from intracranial to intrathecal treat-

18  ment. *Id.* They acknowledged that the only way to avoid spending years developing a data set

19  sufficient to convince the FDA that intrathecal cyclodextrin treatments were safe would be to ref-

20  erence the Hempels' data. *Id.* ¶ 86. Rather than ask the Hempels for permission, however, they

21  said they would secure access through "backchannels" at the FDA. *Id.* ¶ 88.

22         Upon information and belief, that is precisely what the NIH researchers did. *Id.* Just three

23  months after saying their options were either (a) spend years compiling safety data, or (b) misap-

24  propriate the Hempels' trade secrets, NIH-funded researchers began intrathecal cyclodextrin study

25  using dosages supported by the Hempels' data. Compl. ¶¶ 85-88. Thereafter, Vtesse took over the

26  _____

27  [2] A right of reference is an instruction to the FDA to consider one party's proprietary data when considering another party's proposed protocol. *See, e.g.,* 21 C.F.R. § 312.23(b).

28                                         6

1 | NIH's intrathecal cyclodextrin trial. *See id.* ¶¶ 76-77. And Vtesse placed the NIH-funded research-
2 | ers who were conducting the trial, *i.e.*, the NIH-funded researchers who had misappropriated the
3 | Hempels' Protected Material, on its scientific review board. *Id.* ¶¶ 81-91.

4 | **D.   Sucampo Acquires Vtesse for $200 Million and Subsumes Its Operations**

5 | In January 2016, Vtesse announced it had secured key approvals for its intrathecal cy-
6 | clodextrin treatment for NPC, *i.e.*, Breakthrough Therapy and Rare Pediatric Disease designations.
7 | Compl. ¶ 92. In April 2017, Sucampo announced it had purchased Vtesse for $170 million in cash
8 | and 2.8 million Sucampo shares. *Id.* ¶ 93. Sucampo's valuation of Vtesse was based upon the
9 | expected FDA grant of commercial exclusivity to VTS-270 (a cyclodextrin molecule equivalent
10 | to the molecule used by the Hempels in their studies) to treat NPC, and the expected Priority Re-
11 | view Voucher that would follow. *Id.* ¶ 112. In December 2017, Mallinckrodt announced that it
12 | was acquiring Sucampo and VTS-270. *See* Decl. of Joshua L. Seifert, dated Apr. 23, 2018 ("Seifert
13 | Decl."), Ex. 5. Vtesse was barely mentioned—only as the prior owner of VTS-270—because it
14 | had been fully enveloped into Sucampo's enterprise. *Id.*

15 | **ARGUMENT**

16 | "Federal pleading rules call for 'a short and plain statement of the claim showing that the
17 | pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2). A plaintiff need only allege "sufficient
18 | factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*
19 | *Iqbal*, 556 U.S. 662, 678 (2009). The court takes all material allegations as true, and construe[s]
20 | them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898
21 | (9th Cir. 1986). "A claim has facial plausibility when the plaintiff pleads factual content that allows
22 | the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."
23 | *Iqbal*, 556 U.S. at 678. The law "do[es] not countenance dismissal of a complaint for imperfect
24 | statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct.
25 | 346, 346 (2014).

26
27
28

7

I.       **THE HEMPELS HAVE STATED A CLAIM FOR BREACH OF CONTRACT**

Defendants' motion to dismiss the Hempels' contract claim misapprehends corporate pro-
moter law, ignores the implied contract between Cydan and the Hempels, and overlooks the alle-
gations that Cydan executives both used the Hempels' Protected Material and improperly disclosed
it to Vtesse, which knowingly accepted the benefit of those contracts and breaches.

A.      **The Hempels Have Alleged Enforceable Contracts with Cydan**

The Complaint alleges at least two agreements between the Hempels and Cydan: (i) the
Confidentiality Agreement and (ii) an implied contract related to the Business Plan.

1.       **The Confidentiality Agreement is Enforceable**

Defendants argue the Confidentiality Agreement is unenforceable because the Hempels
never incorporated Solution Therapeutics. DM 4. Defendants are incorrect. The Hempels were
Solution Therapeutics's promoters. Therefore, they have the right to enforce contracts they entered
into on its behalf.

"Contracts are frequently made by promoters on behalf of corporations which they expect
to organize," such that for purposes of enforcement, "the contract is treated as that of the pro-
moter." 12 S. Williston, *Contracts* §35:71, pp. 534-35 (4th Ed. Lord 1999). As the Nevada Su-
preme Court has recognized, a corporate promoter is only "divested of his rights" to enforce a pre-
incorporation contract when the corporation is substituted for the promoter by novation. *Jacobson
v. Stern*, 96 Nev. 56, 61 (1980) (cited at DM 4). In other words, corporate promoters "retain the
power to enforce pre-incorporation contracts—*even if the proposed corporation never even comes
into being*." *T St. Dev., L.L.C. v. Dereje*, Civ. Action No. 05-524 (GK), 2005 U.S. Dist. LEXIS
38713, *14-15 (D.D.C. Dec. 19, 2005) (emphasis added); *see also Hoppe v. Percheron Assocs.
LLC*, No. 11-cv-03233-CBS, 2012 U.S. Dist. LEXIS 107149, at *11 (D. Colo. Aug. 1, 2012) (cit-
ing cases); *Davis Wine Co. v. Vina Y Bodega Estampa, S.A.*, 823 F. Supp. 2d 1159, 1176 (D. Or.
2011) (citing cases); 18 Am. Jur. 2d *Corporations* §136 (2011) ("Generally, a promoter is entitled
to the benefit of the contract he made on behalf of the corporation and is a proper party plaintiff to
enforce those rights."); 1A William Meade Fletcher *et al.*, *Fletcher Cyclopedia of the Law of*

8

1 | *Private Corporations* § 271 (Perm. Ed. 2010) (same); Restatement (Third) of Agency § 6.04 (3rd
2 | 2006) (same).

3 |      The Hempels executed the Confidentiality Agreement on behalf of Solution Therapeutics,
4 | the corporation they intended to form. *See* Confidentiality Agreement. The Hempels conferred the
5 | benefits of that contract on Cydan by disclosing their confidential information. Thus, the Hempels
6 | can hold Defendants liable for its breach. Indeed, Defendants cannot accept the benefits of the
7 | Confidentiality Agreement while repudiating its terms. *Chartrand v. Barney's Club, Inc.*, 380 F.2d
8 | 97, 102 (9th Cir. 1967).

9 | **2.    An Implied Contract Governed Use of the Business Plan**

10 |      The Hempels also had an implied contract with Cydan regarding their Business Plan. An
11 | implied-in-fact contract exists where "the parties intended to contract and promises were ex-
12 | changed, the general obligations for which [were] sufficiently clear." *Commonwealth Land Title*
13 | *Ins. Co. v. Iota Indigo, LLC*, No. 2:13-cv-01837-MMD-PAL, 2014 U.S. Dist. LEXIS 5912, at *3-
14 | 4 (D. Nev. Jan. 14, 2014) (quotation marks omitted). Moreover, "an express agreement regarding
15 | the confidentiality of particular information may be evidence of the parties' expectations regarding
16 | the confidentiality of other information not within the scope of the agreement." Restatement
17 | (Third) of Unfair Competition § 41 cmt. b (3rd 1995). A business plan may be protected by an
18 | implied contract of confidentiality when the plan is novel and concrete. *Bergman v. Electrolux*
19 | *Corp.*, 558 F. Supp. 1351, 1353 (D. Nev. 1983). "Novelty pertains to originality or innovation;
20 | concreteness means that the idea has been sufficiently developed so as to be ready for immediate
21 | use without additional embellishment." *Id.* Whether the plan is novel and concrete is a question of
22 | fact. *Id.*

23 |      Cydan and the Hempels entered into an implied contract to maintain the confidentiality of
24 | the Business Plan. On behalf of Cydan, Adams initiated contact with the Hempels to discuss col-
25 | laboration, and solicited a meeting. *Id.* ¶¶ 43-49; *see also* Hempel Decl. ¶¶ & Exs. 1-2. In advance
26 | of that meeting, Hugh sent the Business Plan, which he prominently marked "Confidential." *Id.* ¶
27 | 45; *see also* Business Plan. Thereafter, the parties executed a Confidentiality Agreement which

28 |

expressly included "business plans." Confidentiality Agreement § 1(a). Under the circumstances show Cydan implicitly agreed it would not use the Business Plan without the Hempels' consent.

The Business Plan was novel and concrete. Compl. ¶¶ 45-47; *see also* Business Plan. It was novel. It set forth a path for the commercialization of cyclodextrin—a new treatment for NPC that had never been commercialized—and it was buttressed by the Hempels' unique body of medical research regarding intrathecal cyclodextrin treatments. *See* Business Plan. In fact, Cydan responded to the Business Plan by saying that the Hempels' work was "truly amazing." *Id.* ¶ 48.

And it was concrete. Oral presentations, demonstrations, and written proposals of ideas that are sufficiently developed to be "usable" satisfy the concreteness requirement. *Bergman*, 558 F. Supp. 1351; *cf. On Demand Direct Response, LLC v. McCart-Pollak*, No. 2:15-cv-01576-MMD-NJK, 2017 U.S. Dist. LEXIS 123780, at *8 (D. Nev. Aug. 4, 2017) (holding idea and brochure sufficient to create property interest for quasi-contract). Here, the Business Plan was a 43-page presentation detailing the business goals and the scientific and medical research data establishing the viability of the enterprise, along with the relevant collaborators and ongoing research to illustrate the flexibility of the enterprise. Compl. ¶¶ 45-46; *see also* Business Plan. And Cydan executed that plan in Vtesse. Accordingly, Plaintiffs have alleged an implied contract.

**B.   The Complaint Alleges Cydan and Vtesse Breached those Contracts**

The Complaint plausibly alleges that Defendants breached the Confidentiality Agreement and implied contract regarding the Business Plan.

A breach of confidentiality can be plausibly inferred from the circumstances of the disclosure and alleged breach. *See Gilead Scis., Inc. v. Abbott Labs., Inc.*, Civil Action No. 13-2034-GMS, 2015 U.S. Dist. LEXIS 31006, at *23-28 (D. Del. Mar. 13, 2015) (finding plausible breach when plaintiff's confidential disclosure of efficacy data in the context of potential acquisition occurred in close proximity to defendant's filing of related patent applications).

The Hempels have plausibly alleged that Cydan breached the Confidentiality Agreement. Cydan promised not to use the Hempels' Protected Material—including, but not limited to, their "current and planned drug and biologic delivery systems and agents, medical or diagnostic

10

treatments," and their business plans—for any purpose except for exploring a joint venture. Compl. ¶¶ 51-54; *see also* Confidentiality Agreement, Recitals & §§ 1 & 3. At the time, the Hempels' medical research related to intrathecal treatments of cyclodextrin was unique; it was the only resource from which to analyze the commercial prospects of an enterprise dedicated to intrathecal treatments of cyclodextrin. *See* Compl. ¶¶ 37-40 & 85-88. Four months after signing the Confidentiality Agreement, reviewing the Hempels' Protected Material, and eliciting assistance from the Hempels, Cydan told the Hempels that it intended to go forward with the joint venture. Compl. ¶¶ 65-66. And it did so, only by cutting the Hempels out without their consent. Cydan's misuse is manifest.

The allegations in the Complaint also give rise to a plausible inference that Cydan used the Business Plan. First, Cydan *admitted* it was going forward with the Hempels' proposal. *See* Compl. ¶¶ 65-66; *see also* Hempel Decl. Ex. 7. Second, Cydan formed Vtesse and its executives sat on Vtesse's board of directors. Compl. ¶ 72. And, third, Vtesse is virtually identical to Solution Therapeutics, as described in the Business Plan. Both are corporations dedicated to developing intrathecal cyclodextrin treatments for NPC using the same dosing strategies. Both focused on obtaining a Priority Review Voucher as a primary source of value. And Vtesse placed on its science review board the same researchers identified in the Business Plan. *Id.* ¶¶ 70-74; *see also* Business Plan 13. The timing of the disclosure and Cydan's creation of an identical company dedicated to an identical treatment for an ultra-rare disease gives rise to a plausible inference of misuse.

For their part, Defendants rely upon inapposite case law, *i.e.*, cases involving plaintiffs pleading the contents of the wrong contract, *see US Bank, N.A. v. Recovery Servs. Northwest, Inc.*, Case No. 2:13-cv-01254-APG-GWF, 2014 U.S. Dist. LEXIS 47172, at *5 (D. Nev. Apr. 4. 2014), or failing to identify relevant contractual clauses, *see Desio v. Russell Rd. Food & Bev., LLC*, No. 2:15-cv-01440, 2016 U.S. Dist. LEXIS 123077, at *9-10 (D. Nev. Sept. 9, 2016). By contrast, the Hempels have identified the clauses of the contract that were breached, Compl. ¶¶ 52-55, and have explained how Defendants breached those clauses, *id.* ¶¶ 69-91.

Defendants' bald assertion that the Hempels' confidential information was publicly

11

available is equally flawed. Defendants' concede that the Hempel Twins' medical data was confidential. DM 8. The confidential information included confidential submissions to the FDA. Compl. ¶ 57. And there is no merit to Defendants' claim that the results of Hempels' collaborations with Johnson & Johnson were non-confidential, DM 5, because collaboration in confidence does not constitute disclosure, *see Bartech Sys. Int'l, Inc. v. Mobile Simple Sols., Inc.*, No. 2:15-cv-02422-MMD-NJK, 2016 U.S. Dist. LEXIS 68030, at *18 (D. Nev. May 24, 2016). Finally, even if all of the information were publicly-available, "compilations of publicly-available information, if they took time and effort to create, may be protected by confidentiality agreements." *Orthofix Inc. v. Gordon*, No. 1:13-cv-01463-SLD-TSH, 2016 U.S. Dist. LEXIS 38852, at *26 (C.D. Ill. Mar. 24, 2016). Ultimately, whether the confidential information was public is a fact issue.

In sum, the Complaint plausibly alleges that the Hempels invested years, and millions of dollars, taking enormous personal risks to develop the confidential information, and that Cydan made unauthorized use of the Hempels' confidential information and Business Plan.

### C.   Vtesse is Bound by Cydan's Contracts with the Hempels

A corporation may, when organized, expressly or impliedly ratify contracts entered into by its promoters prior to its existence. *Jacobson*, 96 Nev. at 60-61 (cited at DM 4); *see also Chartrand*, 380 F.2d at 100-02. Ratification occurs when the company accepts the benefits of the contract. *Jacobson*, 96 Nev. at 60-61; *see also Chartrand*, 380 F.2d at 100-02. Vtesse was formed by Cydan executives who had knowledge of the Hempels' confidential information and Business Plan, and who sat on Vtesse's board of directors. Compl. ¶¶ 43-56 & 72. Vtesse thus accepted the benefits of Cydan's contracts with the Hempels, *i.e.*, access to the Hempels' confidential information and knowledge of the commercial viability of their proposal, and exploited that knowledge and information when executing the Hempels' Business Plan. Thus, Vtesse ratified its contractual obligations to the Hempels and is liable for their breach.

### II.   THE HEMPELS HAVE STATED A CLAIM FOR MISAPPROPRIATION

Under Nevada law, the elements of a misappropriation of trade secrets claim are: (1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or

12

1 │ nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be

2 │ wrongful because it was made in breach of an express or implied contract or by a party with a duty

3 │ not to disclose. *Frantz v. Johnson*, 116 Nev. 455, 466 (2000) (applying Nevada's Uniform Trade

4 │ Secrets Act, Nev. Rev. Stat. §§ 600A.010-.100 ("NUTSA"). Each element is adequately alleged.

5 │     **A.    The Hempels' Disclosed Trade Secrets to Cydan**

6 │     A "trade secret" is "information" that "[d]erives independent economic value . . . from not

7 │ being generally known" and "[i]s the subject of efforts that are reasonable under the circumstances

8 │ to maintain its secrecy." Nev. Rev. Stat. § 600A.030 (emphasis added). The Restatement likewise

9 │ defines a trade secret as "any information that can be used in the operation of a business or other

10 │ enterprise and that is sufficiently valuable and secret to afford an actual or potential economic

11 │ advantage over others." Restatement (Third) of Unfair Competition § 39. "[T]he requirement of

12 │ secrecy is satisfied if it would be difficult or costly for others who could exploit the information to

13 │ acquire it without resort" to wrongful conduct. *Id.* § 39, cmt f. Whether information constitutes a

14 │ trade secret is a question of fact. *Frantz*, 116 Nev. at 466.

15 │     Defendants insist the Hempels have not identified the trade secrets with specificity. DM 8.

16 │ There is no such requirement where, as here, the information at issue is a voluminous body of data

17 │ and research. *See Glob. Advanced Metals USA, Inc. v. Kemet Blue Powder Corp.*, No. 3:11-cv-

18 │ 00793, 2012 U.S. Dist. LEXIS 126550, at *17 (D. Nev. Sept. 6, 2012) (cited in DM 22). In any

19 │ event, the Hempels have carefully identified the trade secrets they disclosed:

20 │     *First*, the Hempels disclosed "all information related to their daughters' treatment with

21 │ cyclodextrin," including their intrathecal dosages and results of their intrathecal injections. *See*

22 │ Compl. ¶¶ 57 & 62. Defendants concede that information was secret. DM 13. The Hempels also

23 │ disclosed their confidential FDA submissions. Compl. ¶¶ 57. The medical data and FDA submis-

24 │ sions established the viability of the Hempels' intrathecal cyclodextrin treatment for NPC that was

25 │ the foundation for Vtesse's business model.

26 │     *Second*, a business plan can constitute a trade secret. *See Fuhu, Inc. v. Toys "R" Us, Inc.*,

27 │ No. 12cv2308-WQH-WVG, 2013 U.S. Dist. LEXIS 196563, at *26-27 (S.D. Cal. Mar. 1, 2013);

28 │

13

1  *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 649 F. Supp. 2d 702, 718-19 (N.D.

2  Ohio 2009). Here, the Business Plan was novel, concrete, and supported by secret and commer-

3  cially valuable compilations of data establishing its viability. *See* Compl. ¶¶ 45-47 & 60.

4      *Third*, the Hempels provided Cydan with industry contacts and a library of research. *Id.* ¶¶

5  59, 63. Though some of this information could be described colloquially "public," that is not dis-

6  positive of its trade secret quality. "Even if all of the information is publicly available, a unique

7  compilation of that information, which adds value to the information, also may qualify as a trade

8  secret." *Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 686 (11th Cir. 1998); *see also*

9  Restatement (Third) of Unfair Competition § 39, cmt f. The Hempels' compilation of data and

10  goodwill gave Cydan a competitive advantage because it lent legitimacy to Cydan's efforts and

11  saved Cydan years it would have needed to turn Vtesse into a viable investment vehicle.

12      The Hempels' trade secrets obviously gave Defendants an economic advantage, but De-

13  fendants dispute whether the Hempels made reasonable efforts to maintain their secrecy. DM 7-8.

14  Defendants thereby improperly dispute the truth of factual allegations alleging that the Hempels'

15  kept their trade secrets in confidence. *See, e.g.*, Compl. ¶¶ 8, 10, 42, 45, 57, 62, & 77.

16      Defendants' arguments are factually baseless, and legally non-dispositive. "Trade secret

17  rights can survive even relatively broad dissemination if the disclosures are made in confidence."

18  Restatement (Third) of Unfair Competition § 39. Disclosures subject to express or implied confi-

19  dentiality agreements do not affect trade secret status. *See, e.g., V'Guara Inc. v. Dec*, 925 F. Supp.

20  2d 1120, 1125 (D. Nev. 2013) (disclosure to "someone who needed it" on terms of confidentiality

21  created presumption of secrecy). And marking documents as "Confidential" is sufficient to create

22  a presumption of secrecy. *Id.* at 1124); *see also* Nev. Rev. Stat. § 600A.032.

23      The Hempels made reasonable efforts to maintain secrecy. They kept the information in a

24  password-protected database. Compl. ¶ 57. They disclosed their trade secrets to Defendants pur-

25  suant to a Confidentiality Agreement. *Id.* ¶¶ 50-54. And the Business Plan was prominently marked

26  "Confidential" on its front cover. *See* Business Plan.

27      Though the Hempels' made limited disclosures to specific researchers, Compl. ¶¶ 37, 77,

28                                           14

78, & 82-83, they were always *for medical purposes*, *i.e.*, to ease the suffering of children afflicted by NPC, and always with the mutual understanding that their trade secrets would not be disseminated or otherwise used *for commercial purposes*. Compl. ¶¶ 75-91. Disclosures under those circumstances evidence reasonable efforts to maintain secrecy, and do not affect trade secret protection. Indeed, when Defendants point to the RORs as evidence of public disclosure, they completely miss the mark. DM 8-9. An ROR shows that the subject information is both valuable and secret. *See A. L. Labs. Inc. v. Philips Roxane, Inc.*, 803 F.2d 378, 381 (8th Cir. 1986).

Finally, Defendants make the irrelevant observation that some of the Hempels' cyclodextrin protocols were public. DM 7. Disclosure of formulas does not affect the trade secret quality of the underlying data. *See, e.g.*, *Allied Erecting*, 649 F. Supp. 2d at 718-19 (finding public availability of formula irrelevant where "the trade secret consists of the actual data that allows an engineer to make those calculations"). The trade secrets were not the protocols, but rather the confidential data collected in connection with those protocols that demonstrated their efficacy.

### B.   Cydan Had a Duty of Non-Use and Non-Disclosure

NUTSA prohibits disclosure of another's trade secret when the trade secret was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Nev. Rev. Stat. § 600A.030(2); *see also Bartech*, 2016 U.S. Dist. LEXIS 68030, at \*20. "During negotiations with prospective buyers, customers, or licensees, for example, it is sometimes necessary to disclose trade secrets in order to permit the other party to evaluate the merits of the proposed transaction. The law of trade secrets provides the necessary assurance that the limited purpose of such disclosures will be respected." Restatement (Third) of Unfair Competition § 41; *see also Phillips v. Frey*, 20 F.3d 623, 631-32 (5th Cir. 1994) (holding that disclosures in the context of business negotiations are implicitly confidential).

Defendants acquired the Hempels' trade secrets under circumstances that created a duty of secrecy. They initiated contact with the Hempels, sought a private meeting, received a Business Plan conspicuously marked "Confidential," and executed a Confidentiality Agreement with the Hempels to their password-protected trade secrets.

15

1   Defendants assert that the Hempels' were unreasonable to disclose their Business Plan to
2   Cydan, "a company they presumably knew was interested in developing a treatment for NPC."
3   DM 7. That argument is stunningly cynical. "The maintenance of standards of commercial ethics
4   and the encouragement of invention are the broadly stated policies behind trade secret law. The
5   necessity of good faith and honest, fair dealing, is the very life and spirit of the commercial world."
6   *Kewanne v. Bicron*, 416 U.S. 470, 481-82 (1974). Defendants effectively concede they opportun-
7   istically took advantage of the Hempels, a family that took enormous personal risks to develop a
8   treatment for their terminally-ill children, as well as other NPC children around the world. De-
9   fendants' opportunism is precisely the kind of behavior trade secret laws are designed to punish.

10          C.      **Cydan Used and Disclosed the Hempels' Trade Secrets**

11          The Complaint alleges Defendants used and disclosed the Hempels' trade secrets. A plain-
12   tiff is not required to plead precisely how the trade secrets were misappropriated. *See Space Data*
13   *Corp. v. X*, No. 16-cv-03260, 2017 U.S. Dist. LEXIS 22571, at *5 (N.D. Cal. Feb. 16, 2017) (cited
14   at DM 8). "[W]hen a defendant has access to a plaintiff's trade secrets in the course of a confiden-
15   tial relationship, the defendant's subsequent manufacturer of a closely similar [product] shifts the
16   burden to the defendant to show it independently developed its product." *SleekEZ, LLC v. Horton*,
17   No. CV 16-09-BLG-SPW-TJC, 2018 U.S. Dist. LEXIS 33858, at *18 (D. Mont. Jan. 8, 2018).

18          The Hempels have satisfied their burden. After gaining access to the Hempels' trade secrets
19   under obligations of confidentiality, Cydan told the Hempels it intended to go forward with their
20   joint venture. Compl. ¶¶ 65-66. Two months later, Cydan launched a company that mimicked the
21   Hempels' Business Plan and that only would have been possible by reference to the Hempels'
22   trade secrets. *Id.* ¶ 70. Then Cydan improperly (a) disclosed those trade secrets to Vtesse—an
23   entity that directly competed with the Hempels' commercial interests—by, among other things,
24   placing its executives in control of Vtesse, and (b) used those trade secrets to develop an asset that
25   mirrored the Hempels' proposal. *Id.* ¶¶ 71-74.

26          D.      **Vtesse and Sucampo are Liable for Misappropriation**

27          Defendants argue that Vtesse and Sucampo are not liable for misappropriation. DM 8-9.

28                                                      16

1  Defendants ignore the relevant case law.

2          1.      **Vtesse and Sucampo Knew or Should Have Known**
3                  **They Were Benefitting from Cydan's Misappropriation**

4          A party may be liable for misappropriation where it knew or had reason to know it was
5  receiving or benefitting from misappropriated trade secret information. *See New Eng. Life Ins. Co.*
6  *v. Lee*, No. 2:14-CV-1797 JCM (NJK), 2015 U.S. Dist. LEXIS 39462, at *20 (D. Nev. Mar. 27,
7  2015); *see also PMC, Inc. v. Kadisha*, 93 Cal. Rptr. 2d 663, 669-79 (Cal. Ct. App. 2000) (holding
8  investors of a corporation liable for misappropriation even though trade secret misappropriation
9  began before their investment); 2-7 Milgrim on Trade Secrets § 7.02[2][c] ("There is apt to be
10  imputation of knowledge to the second user where it is a corporation organized by persons subject
11  to a duty of secrecy to the first user." (citing cases)). Here, prior to Vtesse's formation, the Hempels
12  were the only people in the world who had collected a comprehensive data set regarding intrathecal
13  treatments of cyclodextrin, which was the foundation of Vtesse's enterprise. It is implausible that
14  Vtesse would dedicate its venture to intrathecal cyclodextrin treatments, that its investors would
15  invest millions in that venture, and that Sucampo would purchase that enterprise for $200 million,
16  without realizing that they were benefiting from the unauthorized use of the Hempels' trade se-
17  crets. Accordingly, Vtesse and Sucampo are liable for the misappropriation Cydan initiated be-
18  cause they ratified and benefited from it.

19          Moreover, a promoter's knowledge is imputed to a corporation if the promoter becomes a
20  director. *See Bates v. Cottonwood Cove Corp.*, 84 Nev. 388, 391-92 (1968); *cf. USACM Liquidat-*
21  *ing Trust v. Deloitte & Touche LLP*, 764 F. Supp. 2d 1210, 1217-18 (D. Nev. 2011). And "[i]t is
22  well-established that, if a later formed legal entity accepts benefits from earlier offenses, it may be
23  liable for those offenses." *Seibold v. Camulos Partners LP*, No. Civ.A.5176, 2012 Del. Ch. LEXIS
24  216, at *87 n.210 (Del. Ch. Sept. 17, 2012); 1A Fletcher, *Cyclopedia* § 218 (same). Here, Vtesse
25  knowingly accepted the benefits of Cydan's misconduct because Cydan executives with
26  knowledge of the misappropriation—Adams and Csimma—sat on Vtesse's board. Compl. ¶ 72.
27  As such, Vtesse accepted liability for their misconduct.

28
                                    17

1

**2.     Vtesse Is Liable for Its Own Acts of Misappropriation**

2        Vtesse is also liable for independent acts of misappropriation. Intentionally soliciting dis-

3  closure of trade secrets from third-parties under obligations of non-disclosure is misappropriation.

4  *See, e.g., Colgate-Palmolive Co. v. Carter Prods., Inc.*, 230 F.2d 855, 865 (4th Cir. 1956).

5        Vtesse sponsored NIH researchers who, as Vtesse knew, had gained access to the

6  Hempels' trade secrets *for medical research purposes* on conditions of confidentiality and non-

7  competition, and then encouraged those researchers to misappropriate the Hempels' trade secrets

8  for its own commercial gain. Compl. ¶¶ 75-91. Vtesse knew or should have known that those

9  researchers had a duty not to use or disclose the Hempels' trade secrets for a competing purpose.

10  Moreover, those researchers' knowledge of their duties of confidentiality is imputed to Vtesse by

11  virtue of their placement on Vtesse's scientific board of review. *See* Compl. ¶¶ 81 & 91.

12  **III.   THE HEMPELS' COMMON LAW CLAIMS ARE NOT**

13  **PREEMPTED AND ARE ADEQUATLEY PLEADED**

14       **A.    The Hempels' Claims Are Not Preempted by NUTSA**

15       Contrary to Defendants' assertions, NUTSA does not preempt all claims that arise from a

16  factual circumstance possibly involving a trade secret. *SVI, Inc. v. Supreme Corp.*, No. 2:16-cv-

17  01098-JAD-NJK, 2017 U.S. Dist. LEXIS 81983, at *18-26 (D. Nev. May 30, 2017). NUTSA does

18  not affect contract claims, and only displaces "conflicting" tort and restitutionary laws of Nevada.

19  Nev. Rev. Stat. 600A.090(1) ; *see also Frantz*, 116 Nev. at 465 n.3 (NUTSA does not preempt

20  claims "that do not depend on the information at issue being deemed a trade secret").[3]

21       Defendants' misconduct goes beyond misappropriation of trade secrets. Defendants

22  wrongfully used and disclosed the Hempels' Business Plan and Protected Material, which were

23  subject to express and implied contracts. The Hempels' tort and restitutionary claims premised on

24  those breaches are not preempted. *See Custom Teleconnect, Inc. v. Int'l Tele-Servs., Inc.*, 254 F.

25

26  [3] In contrast to Nevada's narrow approach to preemption, some jurisdictions have taken a broader view. *See K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 90 Cal. Rptr. 3d 247,

27  259 (Cal. Ct. App. 2009) (contrasting California's blanket preemption with the narrow approach). Thus, the cases cited by Defendants that apply blanket preemption are inapposite. *See* DM 9-11.

28                                    18

1  Supp. 2d 1173, 1183 (D. Nev. 2003) (quoted in DM 10). Moreover, Defendants breached various
2  duties related to their joint venture with the Hempels, including duties of loyalty and good faith,
3  by diverting the intrathecal cyclodextrin opportunity to Vtesse and denying the Hempels any part
4  of the venture. Defendants themselves cite cases holding that NUTSA does not preempt such
5  claims. *See, e.g., SVI*, 2017 U.S. Dist. LEXIS 81983, at *18-26 (cited in DM 11 n.6).

6          Dismissal on preemption grounds would also be premature because the Hempels are per-
7  mitted to plead in the alternative. Rule 8 permits a plaintiff to plead common law claims, even if
8  they might otherwise be preempted by the UTSA. *See Montgomery v. Etreppid Techs., LLC*, Nos.
9  3:06-CV-00056-PMP-VPC, 3:06-CV-00145-PMP-VPC, 2008 U.S. Dist. LEXIS 28118, at *9 (D.
10 Nev. Apr. 7, 2008).

11         **B.    The Hempels Have Stated Common Law Claims**

12              **1.    The Hempels Have Stated a Claim for Breach of Fiduciary Duty**

13         This Court has recognized the fiduciary or confidential relationship between joint ventur-
14 ers. *Nichols v. Findlay Auto. Grp., Inc.*, No. 2:12-cv-00093-MMD-VCF, 2013 U.S. Dist. LEXIS
15 25960, at *9 (D. Nev. Feb. 26, 2013). A joint venture is an "informal partnership wherein two or
16 more persons conduct some business enterprise, agreeing to share jointly, or in proportion to cap-
17 ital contributed, in profits and losses." *Id.* (quotation omitted). The fiduciary relationship between
18 joint venturers "may be predicated upon an arrangement to assume [a joint venture] relationship."
19 *Riddle v. Simmons*, 922 So. 2d 1267, 1282 (La. App. Ct. 2006). Whether parties are in a joint
20 venture "depends upon the intention of the parties and every case must stand upon its own merits."
21 *Las Vegas Machine & Eng'g Works, Inc. v. Roemisch*, 67 Nev. 1, 9 (1950). It is axiomatic that
22 venturers "owe one another the duties of loyalty, good faith, honesty, and full disclosure." *Nichols*,
23 2013 U.S. Dist. LEXIS 25960, at *9. "[A] coventurer may not acquire and retain for him- or herself
24 any private or secret advantage in connection with the common enterprise." 46 Am. Jur. 2d *Joint*
25 *Ventures* § 34.

26         This Court's opinion in *Nichols*, holding that the plaintiff adequately alleged a joint ven-
27 ture, is directly on point. In *Nichols*, the plaintiff alleged the parties met, "discuss[ed] working

28                                          19

together to develop and promote an opportunity," and the defendant "followed-up the meeting with an email" noting that the defendant "was 'looking forward to developing this opportunity together.'" *Nichols*, 2013 U.S. Dist. LEXIS 25960, at *10-11. The plaintiff also alleged the parties subsequently collaborated to develop a website and the "details of the advertising campaign to be used with the concept." *Id.* at *11. Thereafter, the defendant created a directly competing product in violation of the parties' relationship. *Id.* at *11.

The same thing happened here: Cydan solicited a confidential relationship with the Hempels, and met with them to discuss a joint venture for NPC. Following that meeting. Cydan requested access to the Hempels' Protected Material and asked the Hempels to make introductions to advance their joint venture. After gaining access, and assistance from the Hempels, Cydan touted its enthusiasm about the venture over the course of five months, ultimately confirming that they were "moving forward" with their joint venture. Compl. ¶¶ 65. Cydan then betrayed the collaboration by forming Vtesse, in secret, denying the Hempels' any benefit from the jointly-developed enterprise. *Id.* ¶¶ 69-74.

Defendants' motion is premised on the incoherent argument that their relationship with the Hempels was non-confidential *because* they entered into a Confidentiality Agreement. *See* DM 12. That makes no sense. The Confidentiality Agreement *created* a confidential relationship. Confidentiality Agreement, Recitals, §§ 1 & 3. That confidential relationship developed into a joint venture. And Cydan violated the trust created by that relationship, diverting the opportunity to Vtesse, to the exclusion of the Hempels.

**2.    The Hempels Have Stated a Claim for Unjust Enrichment**

Unjust enrichment reflects "fundamental principles of justice or equity and good conscience." *Topaz Mut. Co. v. Marsh*, 108 Nev. 845, 856 (1992). The elements are "a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." *LeasePartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 113 Nev. 747, 755 (1997).

20

1   Defendants insist Nevada law requires a "direct relationship" to establish unjust enrich-

2   ment. DM 13. That is not so. "Even an indirect benefit will support an unjust enrichment claim."

3   *Momot v. Mastro*, No. 2:09-cv-00975-RLH-LRL, 2011 U.S. Dist. LEXIS 51747, at *6 (D. Nev.

4   May 12, 2011); *Topaz*, 108 Nev. at 856 (recognizing unjust enrichment claim where plaintiff con-

5   ferred indirect benefit). Moreover, unjust enrichment is flexible remedy, and Nevada law merely

6   requires "some direct relationship or dealings" between the benefit-conferring plaintiff and the

7   benefit-appreciating defendant. *On Demand*, 2017 U.S. Dist. LEXIS 123780, at *8.

8   The facts here are similar to *Philips International Investments, LLC. v. Pektor*, 117 A.D.3d

9   1 (N.Y. 1st Dep't. 2014). In *Philips*, a plaintiff entered into a joint venture with two individuals to

10  purchase commercial property. The purchase was not consummated. Plaintiff later discovered that

11  the two individuals had formed different partnerships to purchase the property, effectively cutting

12  the original joint venture out of the transaction. The plaintiff sued the partnerships for unjust en-

13  richment. The court held there was a sufficient relationship between the plaintiff and the partner-

14  ships because the joint venturers:

15          [C]reated the partnership defendants as vehicles to appropriate the
            venture's business opportunity of buying the viable properties. All
16          of the [joint venturers'] knowledge and scheming is, under this the-
            ory, imputable to the partnership defendants . . . . [H]ere, the part-
17          nerships, through the [joint venturers], knew of the alleged wrong
            being done to plaintiff and of their essential role in the allegedly
18          wrongful scheme.

19  *Id.* at 103.[4]

20  Here, Cydan jointly ventured with the Hempels, received and used the Hempels' Protected

21  Material, then diverted the business opportunity from the Hempels to Vtesse and its investors

22  (which included Cydan). And Vtesse knew that it was receiving an improper benefit because,

23  among other things, Cydan executives sat on its board and everyone in the NPC community knew

24  that the Hempels' Protected Material was unique. By imputation and in fact, Vtesse knew it had

25  been unjustly enriched. And it is plausible, if not inescapable, that Sucampo learned it was

26

27  [4] Plaintiffs are not aware of any conflict between New York and Nevada law on this point.

28                                          21

1  receiving an improperly benefit from the Hempels during the course of due diligence.

2            **3.    The Hempels Have Stated a Claim for Tortious Interference**

3        To state a claim for tortious interference a plaintiff must allege (1) a valid and existing

4  contract; (2) defendant's knowledge of the contract; (3) intentional acts intended or designed to

5  disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage.

6  *J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 274 (2003). Each of the elements is alleged.

7        Defendants' motion is flawed in three respects. *See* DM 14. *First*, Cydan and the Hempels'

8  entered into express and implied contracts. *See supra* I.A. *Second*, Vtesse had imputed and actual

9  knowledge of the Hempels' contract by virtue of Adams and Csimma on its board of directors. *See*

10  *supra* I.C. And *third*, Vtesse knowingly disrupted Cydan's contractual relationship with the

11  Hempels by procuring access to and using the Protected Material. *See supra* II.D.

12            **4.    The Hempels Have Stated a Claim for Conversion**

13        Defendants' arguments against the conversion claim have no merit. DM 14-15. *First*, the

14  Hempels have alleged a property interest that is "capable of precise definition" over which they

15  had a "legitimate claim to exclusivity." *M.C. Multi-Family Dev., LLC v. Crestdale Assocs., Ltd.*,

16  124 Nev. 901, 911 (2008). Indeed, the Protected Material was safeguarded by passwords and main-

17  tained in confidence. Compl. ¶ 57.

18        *Second*, Defendants claim "[n]othing prevented Plaintiffs from pursuing a commercial

19  treatment for NPC on their own," and as such, there was no "serious interference" with the

20  Hempels' property rights. DM 15. That argument is specious. Defendants' possession and use of

21  the Hempels' Protected Material seriously interfered with the Hempels' efforts to commercialize

22  their NPC treatment. Today, the Protected Material retains little independent commercial value.

23        And *finally*, Defendants insist that the Hempels have not alleged "actual losses." DM 15.

24  But Nevada has not adopted such a narrow view of damages for conversion. Indeed, *Bader v.*

25  *Cerri*, 96 Nev. 352 (1980), upon which Defendants rely, rejected the idea that "the full value of

26  the property converted" was the "sole measure of damages," in favor of allowing the plaintiff

27  prospective profits, *id.* at 356-58. Moreover, damages can include the value of the converted rights.

28                             22

1    *M.C. Multi-Family Dev.*, 124 Nev. at 912. The Hempels suffered losses because Defendants' con-
2    version and use depreciated the commercial value of the Hempels' Protected Material.

3                     **5.      The Hempels Have Stated a Claim for Civil Conspiracy**

4            To establish a claim for civil conspiracy, a plaintiff must establish: (1) the commission of
5    an underlying tort; and (2) an agreement between the defendants to commit that tort. *GES, Inc. v.*
6    *Corbitt,* 117 Nev. 265, 270-71 (2001). The agreement can be "explicit or tacit." *Id.*

7            An agreement to misappropriate the Hempels' trade secrets is implicit in Defendants' co-
8    ordinated misuse of the Hempels' data. Moreover, Defendants have the requisite intent. "If the
9    actor knows that the consequences are certain, or substantially certain, to result from his act, and
10   still goes ahead, he is treated by the law as if he had in fact desired to produce the result." Restate-
11   ment (Second) of Torts § 8A (2nd 1979). Defendants' specific intent is manifest because tortious
12   harm to the Hempels was the foreseeable outcome of their misconduct. Defendants' assertion that
13   they lacked specific intent because each of them was "misappropriating the Hempels' information
14   for its own gain, not to cause a loss to the Hempels," DM 16, misconstrues the law.

15   **IV.    SUCAMPO AND CYDAN II ARE ALSO LIABLE ON**
16   **         GROUNDS OF VICARIOUS OR SUCCESSOR LIABILITY**

17           Defendants' incorrectly insist Sucampo and Cydan II are not liable for Vtesse and Cydan's
18   misconduct, respectively. DM 20-21. Presuming a modicum of diligence, Sucampo is liable for
19   misappropriation because it knew or should have known that it was acquiring an asset built upon
20   the Hempels' trade secrets and confidential information. *See supra* II.D Moreover, as set forth in
21   Plaintiffs' Opposition to Defendants' Consolidated Motion to Dismiss for Lack of Personal Juris-
22   diction ("Pls.' Opp'n PJ"), Sucampo subsumed Vtesse's operations and assets into its own ongo-
23   ing, giving rise to successor liability. Pls.' Opp'n PJ, Argument I.B. Similarly, Cydan II should be
24   held liable for Cydan's misconduct. Cydan II was formed one month after Cydan sold Vtesse to
25   Sucampo, was capitalized by the same investors, supplanted Cydan's operations, used the same
26   offices and personnel, and continued Cydan's mission. *See id.*

27

28                                                23

1  V.      THE COURT HAS SUBJECT MATTER JURISDICTION

2        Defendants insist Solution Therapeutics's unincorporated status defeats diversity jurisdic-
3  tion. DM 20. But the citizenship of an unincorporated entity depends upon the citizenship of its
4  members. *See Fifty Assocs. v. Prudential Ins. Co. of Am.*, 446 F.2d 1187, 1190 (9th Cir. 1970)
5  (cited in DM 20). The Hempels, sole owners of Solution Therapeutics, are domiciled in Nevada.
6  Compl. ¶ 13. Thus, Solution Therapeutics is a Nevada citizen, and the parties are diverse

7        The Court also has federal question jurisdiction. Count Seven alleges a violation of the
8  Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832, *et seq.* ("DTSA"). The elements of a DTSA
9  claim are the same as a NUTSA claim, except DTSA only covers acts occurring on or after May
10  11, 2016. *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-cv-02177-SI, 2017
11  U.S. Dist. LEXIS 62109, at *8 (N.D. Cal. Apr. 24, 2017). DTSA applies to unauthorized uses after
12  its effective date. *Id.* at *9. The DTSA claim survives because Defendants used the Hempels' trade
13  secrets in research and development that continued through October 2017. Compl. ¶¶ 79 & 91. At
14  minimum, the DTSA applies to Sucampo, which became a misappropriator by its investment in
15  Vtesse—with knowledge of Vtesse's misappropriation—on April 3, 2017. *Id.* ¶ 93.

16                                    **CONCLUSION**

17        For the foregoing reasons, Defendants' motion should be denied. To the extent the Court
18  grants any portion of Defendants' motion, the Hempels request leave to amend the complaint to
19  conform it to their opposition papers and cure any deficiencies identified by the Court.

20  DATED: April 23, 2018

21                                    THE O'MARA LAW FIRM, P.C.

22                                        */s/ David C. O'Mara*
                                      DAVID C. O'MARA

23
                                      JOSHUA L. SEIFERT PLLC
24                                    Joshua L. Seifert, Esq.
                                      *Pro Hac Vice*
25                                    jseifert@seifertpllc.com
                                      175 Varick Street
26                                    New York, NY 10014
27                                    (646) 823-9786

28
                                          24

1

2       SLARSKEY LLC
       David Slarskey, Esq.
3       *Pro Hac Vice*
       dslarskey@slarskey.com
4       800 Third Avenue, 18th Floor
       New York, NY 10022
5       (212) 658-0661

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
        25

**CERTIFICATE OF SERVICE**

I, Valerie Weis, do hereby certify that I am an employee of The O'Mara Law Firm, P.C., and further certify that the foregoing document was electronically filed and served upon all parties via the Court's Electronic Filing system.

DATED:  April 23, 2018

                                                    /s/ Valerie Weis
                                                    VALERIE WEIS

LEWIS ROCA ROTHGERBER CHRISTIE, LLP          WILLIAMS & CONNOLLY, LLP
E. Leif Reid, Esq.                            Paul B. Gafney, Esq
One East Liberty Street                       Jessica Bodger Rydstrom, Esq.
Ste 300                                       Benjamin M. Stoll, Esq.
Reno, NV 89501                                Amanda J. Cox, Esq.
                                              725 Twelfth Street, N.W.
                                              Washington, DC 20005
*Counsel for Defendants*
                                              *Counsel for Defendants*