1   THE O'MARA LAW FIRM, P.C.
     DAVID C. O'MARA
2   NEVADA BAR NO. 8599
3   311 East Liberty St.
     Reno, Nevada 89501
4   (775) 323-1321
     (775) 323-4082 (fax)

5

6   JOSHUA L. SEIFERT PLLC
     Joshua L. Seifert, Esq.
7   *Pro Hac Vice*
     jseifert@seifertpllc.com
8   175 Varick Street
     New York, NY 10014
9   (646) 823-9786

10   SLARSKEY LLC
11   David Slarskey, Esq.
     *Pro Hac Vice*
12   dslarskey@slarskey.com
     800 Third Avenue, 18th Floor
13   New York, NY 10022
     (212) 658-0661
14

15   *Counsel for Plaintiffs*

16   **UNITED STATES DISTRICT COURT**
          **DISTRICT OF NEVADA**
17

18   ADDISON HEMPEL, CASSIDY
     HEMPEL, CHRISTINE HEMPEL, HUGH
19   HEMPEL, and SOLUTION
     THERAPEUTICS,           Case No. 3:18-cv-00008-MMD-VPC

20

21           Plaintiffs,          **MEMORANDUM OF POINTS AND**
                                      **AUTHORITIES IN OPPOSITION TO**
22   v.                                    **DEFENDANTS' CONSOLIDATED**
                                      **MOTION TO DISMISS FOR LACK OF**
23   CYDAN DEVELOPMENT, INC.,       **PERSONAL JURISDICTION**
     CYDAN II, INC., VTESSE, INC.,
24   SUCAMPO PHARMACEUTICALS,
     INC., and DOES I-X and ROE
25   CORPORATIONS I-V, inclusive,

26           Defendants.

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................. 2

    A.   The Hempels' Successful Drug Development Efforts ............................................ 2

    B.   Cydan Targets the Hempels' Protected Material in Nevada ................................. 3

    C.   Cydan Forms Vtesse to Compete With The Hempels ........................................... 5

    D.   Vtesse Meets with the Hempels at Their Home in Nevada .................................. 6

    E.   Sucampo Acquires Vtesse and Subsumes It .......................................................... 7

    F.   Cydan II Takes Over Cydan's Operations ............................................................ 7

ARGUMENT ...................................................................................................................... 8

I.     DEFENDANTS' MOTION TO DISMISS FOR LACK
      OF PERSONAL JURISDICTION SHOULD BE DENIED ........................................... 8

    A.   Defendants Are Subject to Specific
         Jurisdiction Based on Their Purposeful Conduct ................................................. 9

        1.   Defendants Purposefully Directed Their Activities At Nevada ................ 9

             a.   The Elements of Purposeful Direction Are Satisfied .................... 11

             b.   Defendants' Authorities Are Readily Distinguishable ................ 12

        2.   Defendants Purposefully Availed Themselves of Nevada ....................... 14

    B.   Cydan's and Vtesse's Contacts Are Imputed to Cydan II and Sucampo ................. 17

        1.   Sucampo and Cydan II are Successors in Interest ................................... 17

        2.   Sucampo and Cydan II are
             Alter Egos or Agents of Cydan and Vtesse ............................................ 19

II.    DEFENDANTS' MOTION TO TRANSFER SHOULD BE DENIED ........................... 20

CONCLUSION ................................................................................................................. 22

i

1

## TABLE OF AUTHORITIES

2

### CASES

3

4
*Action Embroidery Corp. v. Atlantic Embroidery, Inc.*,
    368 F.3d 1174 (9th Cir. 2004)..................................................................8

5

6
*Advanced Vision Solutions, Inc. v. Lehman*,
    No. 2:14-cv-01597-APG-NJK, 2015 U.S. Dist. LEXIS 9035
    (D. Nev. Jan. 26, 2015)....................................................................11

7

8
*Albertazzi v. Albertazzi*,
    No. 3:17-cv-00703-MMD-WGC, 2018 U.S. Dist. LEXIS 7415
    (D. Nev. Jan. 17, 2018)....................................................................14

9

10
*Alley Cat, Inc. v. Duncan*,
    No. 2:16-cv-02745-JAD-CWH, 2017 U.S. Dist. LEXIS 164079
    (D. Nev. Sep. 28, 2017).............................................................9, 12, 14

11

12
*Andes Industries Inc. v. Cheng Sun Lan*,
    No. 2:14-cv-00400, 2015 Dist. LEXIS 38693 (D. Nev. Mar. 25, 2015)...........17

13

14
*Andritz Inc. v. M&G Finanziaria S.r.l.*,
    No. 1:15-CV-00796-RWS, 2016 U.S. Dist. LEXIS 36644
    (N.D. Ga. Mar. 22, 2016)..................................................................15

15

16

17
*Aventine-Tramonti Homeowners Association v. Vanguard Piping System*,
    Case No. A555328, 2013 Nev. Dist. LEXIS 902
    (Nev. 8th Jud. Dist. Ct. May 15, 2013) .............................................18, 19

18
*Axiom Foods, Inc. v. Acerchem International, Inc.*,
    874 F.3d 1064 (9th Cir. 2017)..............................................................13

19

20
*Banerjee v. Continental Incorporated, Inc.*,
    2:16-CV-669 JCM (VCF), 2016 U.S. Dist. LEXIS 141235
    (D. Nev. Oct. 11, 2016) .................................................................20, 22

21

22
*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) .....................................................................14, 15

23

24
*Casun Invest, A.G. v. Ponder*,
    No. 2:16-CV-2925 JCM (GWF), 2018 U.S. Dist. LEXIS 25564
    (D. Nev. Feb. 16, 2018).....................................................................9, 14

25

26
*Chan v. Society Expeditions, Inc.*,
    39 F.3d 1398 (9th Cir. 1994)...............................................................17

27

28

ii

*Chunghwa Telecom Global v. Medcom*,
  No. 5:13-cv-02104-HRL, 2016 U.S. Dist. LEXIS 138695
  (N.D. Cal. Oct. 5, 2016)..................................................................................20

*CollegeSource, Inc. v. Academyone, Inc.*,
  653 F.3d 1066 (9th Cir. 2011).......................................................................11

*Cruz v. Durbin*,
  No. 2:11-cv-342-LDG-VCF, 2014 U.S. Dist. LEXIS 150328
  (D. Nev. Oct. 20, 2014) ...................................................................................9

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) ........................................................................................8

*Doe v. Unocal Corp.*,
  248 F.3d 915 (9th Cir. 2001)..........................................................................20

*Fairbanks Gold Mining, Inc. v. D & D Tire, Inc.*,
  No. 3:10-cv-00492-ECR-WGC, 2011 U.S. Dist. LEXIS 110244
  (D. Nev. Sept. 23, 2011) ...................................................................... 8, 17, 19

*Fastpath, Inc. v. Arbela Technologies Corp.*,
  760 F.3d 816 (8th Cir. 2014)..........................................................................16

*Geanacopulos v. Narconon Fresh Start*,
  39 F. Supp. 3d 1127 (D. Nev. 2014) ..............................................................20

*Haake v. Strudwick*,
  No. 1:14-cv-00212-CWD, 2014 U.S. Dist. LEXIS 168749
  (D. Idaho Dec. 1, 2014) ..................................................................................10

*Harris Rutsky & Co. Insurance Service v. Bell & Clements*,
  328 F. 3d 1122 (9th Cir. 2002)...................................................................8, 17

*Hoag v. Sweetwater International*,
  857 F. Supp. 1420 (D. Nev. 1994) .................................................................14

*IPOX Schuster, LLC v. Nikko Asset Management Co.*,
  191 F. Supp. 3d 790 (N.D. Ill. 2016).............................................................10

*Jacobson v. Stern*,
  96 Nev. 56 (1980)...........................................................................................14

*Jones v. GNC Franchising, Inc.*,
  211 F.3d 495 (9th Cir. 2000)..........................................................................20

*Levinson v. Second Judicial District Court*,
  103 Nev. 404 (1987)..................................................................................10, 15

iii

*Mayweather v. Wine Bistro*,
　　No. 2:13-cv-210-JAD-VCF, 2014 U.S. Dist. LEXIS 168720
　　(D. Nev. Nov. 17, 2014) ..................................................................................11

*Millenium Drilling Co. v. Beverly House-Meyers Revocable Trust*,
　　No. 2:12-cv-00462-MMD-CWH, 2014 U.S. Dist. LEXIS 24697
　　(D. Nev. Feb. 25, 2014) ..................................................................................13

*Morrill v. Scott Financial Corp.*,
　　873 F.3d 1136 (9th Cir. 2017)........................................................................12

*MYSFYT, Inc. v. Lum*,
　　No. 4:16-cv-03813-KAW, 2016 U.S. Dist. LEXIS 164592
　　(N.D. Cal. Nov. 29, 2016)...............................................................................11

*New England Life Insurance Co. v. Lee*,
　　No. 2:14-CV-1797 JCM (NJK), 2015 U.S. Dist. LEXIS 39462
　　(D. Nev. Mar. 27, 2015) .................................................................................10

*Ognibene v. Lagori*,
　　No. 2:12-cv-01307-RCJ-GWF, 2012 U.S. Dist. LEXIS 151497
　　(D. Nev. Oct. 19, 2012) ..................................................................................15

*Picot v. Weston*,
　　780 F.3d 1206 (9th Cir. 2015)..............................................................13, 17

*PMC, Inc. v. Kadisha*,
　　93 Cal. Rptr. 2d 663 (Cal. Ct. App. 2000)....................................................10

*Rees v. Mosaic Technologies, Inc.*,
　　742 F.2d 765 (3d Cir. 1984)........................................................................8, 15

*Schwarzenegger v. Fred Martin Motor Co.*,
　　374 F.3d 797 (9th Cir. 2004)...................................................................8, 9, 14

*SVI, Inc. v. Supreme Corp.*,
　　No. 2:16-cv-01098-JAD-NJK, 2017 U.S. Dist. LEXIS 81983
　　(D. Nev. May 30, 2017)...........................................................................11, 21

*T Street Development, L.L.C. v. Dereje*,
　　Civ. Action No. 05-524 (GK), 2005 U.S. Dist. LEXIS 38713
　　(D.D.C. Dec. 19, 2005)...................................................................................14

*T-Mobile USA, Inc. v. Huawei Device USA, Inc.*,
　　115 F. Supp. 3d 1184 (W.D. Wash. 2015)....................................................11

*Village Builders 96, Ltd. Partnership v. U.S. Laboratories, Inc.*,
　　121 Nev. 261 (2005)................................................................................18, 19

iv

*Vuori v. Grasshopper Capital LLC*,
    No. 17-cv-06362-JCS, 2018 U.S. Dist. LEXIS 29731
    (N.D. Cal. Feb. 22, 2018) ............................................................................................20

*Walden v. Fiore*,
    134 S.Ct. 1115 (2014)...................................................................................................12

*Wellpartner, Inc. v. DeLeon Pharmacy, Inc.*,
    No. 3:15-cv-01577, 2015 U.S. Dist. LEXIS 158533 (D. Or. Nov. 24, 2015) .................17

*Wells Dairy, Inc. v. Food Movers International, Inc.*,
    607 F.3d 515 (8th Cir. 2010)........................................................................................16

*Wells Fargo & Co. v. Wells Fargo Exp. Co.*,
    556 F.2d 406 (9th Cir. 1977)........................................................................................17

v

1    Plaintiffs Addison, Cassidy, Christine, and Hugh Hempel and Solution Therapeutics
2 ("Plaintiffs" or the "Hempels") respectfully submit this Memorandum of Points and Authorities in
3 Opposition to the Consolidated Motion to Dismiss for Lack of Personal Jurisdiction by Defendants
4 Cydan Development, Inc. ("Cydan"), Cydan II, Inc., Vtesse, Inc., and Sucampo Pharmaceuticals,
5 Inc, ECF No. 11 ("DM PJ").[1]

6                              **PRELIMINARY STATEMENT**

7    Defendants' motion to dismiss for lack of personal jurisdiction, or to transfer venue, should
8 be denied. Cydan deliberately targeted the Nevada-resident Hempels because the Hempels had
9 developed, in Nevada, a pharmaceutical asset that Cydan wanted to commercialize. Cydan entered
10 into a non-disclosure agreement with the Hempels, which was prepared in Nevada and governed
11 by Nevada law (the "Confidentiality Agreement"), and then breached the Confidentiality Agree-
12 ment by systematically misappropriating the Hempels' confidential material—including medical
13 research, patient data, FDA submissions and protocols, commercial plans, industry contacts,
14 know-how, and goodwill (the "Protected Material")—the *situs* of which was Nevada. After fos-
15 tering an on-going relationship with the Hempels over the course of more than eight months, Cydan
16 secretly formed Vtesse for the purpose of exploiting the Protected Material and competing with
17 the Hempels to obtain regulatory approvals for the Hempels' therapeutic drug treatment. As part
18 of this effort, Vtesse's executives visited the Hempels in their Nevada home, purportedly to reas-
19 sure the Hempels that the Hempels would be included in the joint development effort initiated by
20 Cydan, even though those false assurances were intended simply to stave off this dispute. Instead
21 of honoring their obligations to the Hempels, Cydan and Vtesse misappropriated and used the
22 Hempels' Protected Material, cut the Hempels out of the joint venture, obtained an FDA approval
23 in reliance upon the Hempels' Protected Material, and then sold Vtesse to Sucampo for $200 mil-
24 lion. Now, Defendants brazenly contend that this Court lacks the power to compel them to answer
25 for their conduct in this jurisdiction.

26

27 [1] Unless otherwise stated, capitalized terms have the same definition as in the Complaint.

28                                        1

1     This is not a case in which the Defendants randomly or idiosyncratically came into contact
2 with Nevada residents and are unexpectedly being haled into court in Nevada. Rather, Defendants
3 subjected themselves to personal jurisdiction in Nevada based on their own, intentional miscon-
4 duct directed at Nevada, knowing that the consequences of their conduct would be felt in Nevada.
5 Cydan II and Sucampo are also subject to the Court's jurisdiction under theories of successor lia-
6 bility, agency, or alter ego status, in light of their unity of interests and integration with Cydan and
7 Vtesse, respectively. Accordingly, the motion to dismiss for lack of personal jurisdiction should
8 be denied, at the very least so that the parties can engage in jurisdictional discovery.

9     Defendants' application to transfer should also be denied. The Hempels' choice of the Dis-
10 trict of Nevada should be given "substantial deference" because they are residents of the district,
11 because their confidential information and trade secrets were misappropriated from the district,
12 and their injuries were felt in this district. Defendants, meanwhile, have not made any showing of
13 inconvenience, let alone the "strong showing of inconvenience" required to overcome the
14 Hempels' choice.

15     For these reasons, and those detailed below, Defendants' motion should be denied.

16                                 **BACKGROUND**

17     **A.    The Hempels' Successful Drug Development Efforts**

18     Addison and Cassidy Hempel were born on January 23, 2004. *See* ECF No. 1 ("Com-
19 plaint") ¶ 2. In 2007, the Hempel twins were diagnosed with Niemann Pick disease, Type C
20 ("NPC"). NPC is an ultra-rare, progressive neurological disease that causes severe disability and
21 death. *Id.* Currently, there are approximately 100 known cases of NPC in the United States. *Id.*
22 Addison and Cassidy were born, and have resided their entire lives in Reno, Nevada. *See* Decl. of
23 Hugh Hempel, dated April 23, 2018 ("Hempel Decl.") ¶ 1.

24     Spurred by their daughters' diagnoses, Christine and Hugh Hempel both left their employ-
25 ment and invested approximately $3 million of their personal time and money, along with millions
26 of dollars in donations they raised and *pro bono* work they elicited from world-class physicians,
27 to develop their own, privately-developed treatment for NPC. Compl. ¶ 3. The center of the

28
                                          2

Hempels' efforts was their home in Reno, from which they promoted a new drug development business, Solution Therapeutics, to be incorporated as a Nevada corporation. *See* Hempel Decl. ¶ 2 & Ex. 3 ("Business Plan") at 4 (showing Hempels intended Solution Therapeutics to be a Nevada corporation).

The Hempels' innovative translational drug research program met with immediate success, resulting in unprecedented treatment approvals by the United States Food and Drug Administration ("FDA"), in 2009 and 2010, for the clinical use of 2-hydroxypropyl-$\beta$-cyclodextrin ("2HP$\beta$CD" or "cyclodextrin") in treating NPC. Compl. ¶ 4. These events, and the Hempels' commitment to advancing medical and research efforts through family and community-based funding, drew international recognition and attention, including from the National Institutes of Health ("NIH"). *Id.* In May 2010, the FDA granted the Hempels' "Orphan Drug Status" for cyclodextrin, indicating its utility in treating humans, and the small NPC population. *Id.*

From the outset of their research, the Hempels hoped that they would be successful in identifying a therapeutic drug to help their daughters and other NPC patients. *See* Hempel Decl. ¶ 3. By 2013, the Hempels had a carefully compiled library of information related to their daughters' treatment, confidential FDA filings, medical and research data, goodwill, and industry relationships to facilitate obtaining FDA approvals for cyclodextrin. Compl. ¶ 42.

Because NPC is an ultra-rare pediatric disease, the Hempels anticipated that the successful development of a therapeutic drug treatment for NPC could entitle them to a "Priority Review Voucher" from the FDA. Compl. ¶ 7. A Priority Review Voucher may be used to expedite the FDA review of any other drug, and has been sold for as much as $350 million. *Id.* The Hempels hoped to earn a Priority Review Voucher that could be sold by their company, Solution Therapeutics, to fund future research in NPC and to ensure that NPC treatments would be reasonably priced for those in the NPC community. *Id.* ¶ 41.

**B.    Cydan Targets the Hempels' Protected Material in Nevada**

In the summer of 2013, Chris Adams, the then-Chief Business Officer of Cydan, contacted Hugh Hempel by LinkedIn and invited him to connect. *See* Hempel Decl. ¶ 4. Hugh's LinkedIn

3

1 profile identified him, and his business interests, as in the "Reno, Nevada area." *Id.* ¶ 4.

2       Hugh agreed to connect with Adams, and Adams followed up by email, indicating that
3 Cydan was looking for "opportunities" to fund drug programs and invest in "develop[ing] orphan
4 drugs to get them through proof of concept in human clinical trials." Hempel Decl. Ex. 1 at 1.
5 Adams and Hugh began a months-long conversation, during which Adams recruited Hugh from
6 Nevada to visit Cydan's offices in Massachusetts, so that the parties could discuss their collabora-
7 tion. *See, e.g.*, Hempel Decl. ¶ 4 & Ex. 2 at 1-2 (Aug. 19, 2013 email).

8       Hugh agreed to visit Cydan on September 13, 2013, to discuss, among other things, the
9 "Niemann Pick Type C market opportunity," and "[c]yclodextrin (HPBCD) opportunities in other
10 RARE markets." *Id.* Ex. 2 at 1 (Sept. 11, 2013 email). Via email, Hugh told Cydan that he had
11 "founded a virtual BioTech entity called Solution Therapeutics as the funding/development vehi-
12 cle for this treatment," and that the entity was "currently bootstrap funded primarily through [the
13 Hempels'] sweat equity." *Id.* In advance of the meeting, Hugh sent Cydan a copy of the 43-page
14 Business Plan—clearly marked "Confidential"—which the Hempels had prepared based on their
15 substantial investment and knowledge of cyclodextrin research and opportunities. *See* Business
16 Plan. The Business Plan indicated that Solution Therapeutics was intended to be a "C-corp based
17 in Reno, Nevada." *Id.* at 4. Cristina Csimma, Cydan's then-Chief Executive Officer—responded
18 to Hugh's email, writing, "the work you have done is truly amazing." Compl. ¶ 48.

19       Hugh visited Cydan on September 13, 2013. Hempel Decl. ¶ 6. The meeting was attended
20 by Chris Adams, Deborah ("Deb") Geraghty (Vice President of Cydan, for Project & Portfolio and
21 Development), and others. *Id.* The parties discussed the Hempels' successes, to date, and the op-
22 portunity presented by their development of cyclodextrin. *Id.* During this meeting, which lasted
23 more than two hours, Hugh walked Cydan through the Business Plan, which detailed plans to seek
24 an approval for cyclodextrin in treating NPC, pursue a Priority Review Voucher to be sold to a
25 major pharmaceutical company, and reinvest the proceeds into research and treatment for the NPC
26 community. *Id.* In connection with this meeting, Cydan told Hugh that it had not considered the
27 Priority Review Voucher strategy for the development of cyclodextrin. *Id.*

28                                          4

1  Cydan was impressed, and followed up the next day. Noting that Hugh had returned to
2 Reno, Geraghty said Cydan wanted to further discuss "how Cydan may be able to facilitate [cy-
3 clodextrin's] further translation to the clinic." Hempel Decl. ¶ 7 & Ex. 4 at 1 (Sept. 14, 2014 email).
4 Geraghty, specifically requested that Hugh (i) send his standard non-disclosure agreement, (ii)
5 provide Cydan "access to [the Hempels'] 'server,' where [the Hempels] had data and other back-
6 ground information," and (iii) that Hugh introduce Cydan to Dr. Daniel Ory, a researcher at Wash-
7 ington University that Cydan wanted to meet. Id.

8  The Hempels sent Cydan a confidentiality agreement, which Csimma executed. See id. ¶ 8
9 & Ex. 5 ("Confidentiality Agreement"). The Confidentiality Agreement provided for the parties'
10 mutual protection with respect to the disclosure of confidential information, and was governed by
11 Nevada law. Id. 3. With the understanding that the Hempels were protected by Nevada law, the
12 Hempels provided Cydan with access to all of their Protected Material, and engaged in an ongoing,
13 collaborative relationship with Cydan, responding to Cydan's inquiries and providing Cydan with
14 additional information to facilitate a joint venture. See Hempel Decl. ¶ 8.

15  In December 2013, Geraghty emailed Hugh—in direct response to a request from Hugh
16 for an update on Cydan's views vis-à-vis the Solution Therapeutics project—stating that Cydan
17 was still "dig[ging] in to the potential to move cyclodextrin forward" with Solution Therapeutics.
18 See id., Ex. 6. In January 2014, Geraghty emailed Hugh to tell him that they were "[m]oving for-
19 ward for sure" with the venture. See id. Ex. 7 (Jan. 16, 2014 email). And on February 14, 2014,
20 Adams and Hugh had a conference call to discuss next steps. Compl. ¶ 66.

21  **C.   Cydan Forms Vtesse to Compete With The Hempels**

22  Cydan, however, misappropriated the Hempels' confidential information and trade secrets.
23 and diverted the cyclodextrin business opportunity to its affiliate, Vtesse. In May 2014, just months
24 after assuring the Hempels that they were going forward with a joint venture, Cydan formed Vtesse
25 without the Hempels' knowledge or consent. Around the same time, Cydan broke off its commu-
26 nications with the Hempels without explanation, see Hempel Decl. ¶ 10; Compl. ¶ 67, and termi-
27 nated Geraghty, Compl. ¶ 68. Cydan secretly used the Hempels' Business Plan and Protected

28

1   Material to form, and solicit investors for, Vtesse. *Id.* ¶¶ 70-74.

2         After working in secret for months, in January 2015 Cydan publicly announced that it had
3   formed a "spin-off company," Vtesse, to pursue the same drug approvals and business strategy
4   that the Hempels had introduced to Cydan. *See* Seifert Decl. Ex. 1 at 1 (Jan. 7, 2015 Cydan Press
5   Release). Cydan placed its executives—Adams and Csimma—onto Vtesse's Board of Directors,
6   and conveyed the Protected Material to Vtesse (without the Hempels' approval) for further devel-
7   opment of the Hempels' Business Plan. Compl. ¶¶ 70-73. Vtesse, in turn, enlisted intramural and
8   extramural NIH researchers who also had confidential access to the Hempels' drug development
9   information and medical data, and paid them to develop the identical treatments the Hempels had
10  been developing. *Id.* ¶¶ 75-91.

11        **D.    Vtesse Meets with the Hempels at Their Home in Nevada**

12        Immediately after the public launch of Vtesse in January 2015, Vtesse's CEO, Bernardus
13  Machielse, and Vice President of Business Development, Ravi Venkataramani, contacted the
14  Hempels. *See* Hempel Decl. ¶ 11 & Exs. 8-9 (January 2015 emails). On January 20, 2015, Ma-
15  chielse acknowledged that in light of confidentiality concerns, Vtesse could not go forward "with-
16  out the express permission of the parents," *see id.* Ex. 8 (Jan. 20, 2015 email), and on January 26,
17  2015 Machielse wrote to the Hempels that he wanted to meet "face to face," so that they could
18  "work through the open items" between them. *Id.* Ex. 9 (Jan. 26, 2015 email).

19        That meeting took place in Nevada when Machielse and Venkataramain traveled to the
20  Hempels' home, and the Hempels told the executives that Cydan and Vtesse could not simply cut
21  them and the NPC community out of the venture. *See* Hempel Decl. ¶ 12. After the visit, Machielse
22  wrote to the Hempels, acknowledging his visit:

23              Thanks so much for your hospitality yesterday, it was great to meet
                Addi, Cassi and you.
24
25              We are especially grateful for your feedback, input and support for
                our joint journey to bring cyclo[dextrin] over the finish line. Your
26              work and commitment are an inspiration to us and I promise that
                we will work very hard to bring cyclodextrin over the finish line.
27
28                                          6

1
2

> Feel free to contact us anytime, we hope we can continue to build out our relationship and align the community to bring a solution to the NPC children.

3   Hempel Decl. Ex. 9 (Apr. 3, 2014 email).

4   **E.   Sucampo Acquires Vtesse and Subsumes It**

5      On April 3, 2017, Cydan announced "the acquisition of its first rare disease spin-out, Vtesse
6   Inc., by Sucampo Pharmaceuticals, Inc." Seifert Decl. Ex. 2 at 1 (Apr. 3, 2017 Cydan Press Re-
7   lease). Cydan noted "Vtesse was launched by Cydan in 2015 to advance its orphan drug candidate,
8   VTS-270," *i.e.*, cyclodextrin, "for treatment of Niemann-Pick Disease Type C (NPC)." *Id.*
9   Sucampo acquired Vtesse "for an upfront consideration of $200 million," including "the issuance
10   of 2,782,678 shares of Sucampo Class A common stock and $170 million of cash on hand." *Id.*

11      Following the acquisition, Sucampo folded Vtesse into its operations. According to
12   Vtesse's press release, the acquisition "provide[d] Sucampo with VTS-270" and "[b]uilt upon
13   Sucampo's capabilities, global development platform and focus on specialized areas of high, un-
14   met medical need," and Vtesse employees were all "expected to join Sucampo." *Id.* Ex. 3 (Apr. 3,
15   2014 Vtesse Press Release). Vtesse moved its operations from Gaithersburg, Maryland to Rock-
16   ville, Maryland, to consolidate with Sucampo. *Id.* Machielse—Vtesse's CEO—was terminated
17   from Vtesse, and became a consultant to Sucampo. Machielse Decl., ECF No. 11-2, ¶ 4.

18      Just eight months later, in December 2017, Mallinckrodt announced an agreement to ac-
19   quire Sucampo, "including its commercial and development assets." Seifert Decl. Ex. 4 at 1 (Dec.
20   26, 2017 Mallinckrodt Press Release). Though VTS-270 was central to the Mallinckrodt/Sucampo
21   deal, *id.*, Mallinckrodt only mentioned Vtesse as VTS-270's "former owner," *id.* at 2. Thus, the
22   Mallinckrodt deal confirmed that Vtesse had become indivisible from Sucampo.

23   **F.   Cydan II Takes Over Cydan's Operations**

24      One month after orchestrating the sale of Vtesse to Sucampo for $200 million, Cydan
25   formed Cydan II on May 10, 2017. Seifert Decl. Ex. 6. Cydan publicly stated that Cydan II would
26   be operated by the same "experienced team" that had operated Cydan, that Cydan II would "con-
27   tinu[e] the mission of [Cydan]," and that the new funding would "extend [Cydan's] operations for

28                                               7

1  another four years." *Id.* Ex. 5 at 1. Thereafter, Cydan II supplanted Cydan as the public-facing

2  operating Cydan entity. Indeed, the Cydanco website simply changed references to Cydan to ref-

3  erences to Cydan II, Inc. *Compare id.*, Ex. 7 (cydanco.com snapshot as of Feb. 19, 2017) *with* Ex.

4  8 (cydanco.com snapshot as of Apr. 19, 2018).

5                                    **ARGUMENT**

6  **I.    DEFENDANTS' MOTION TO DISMISS FOR LACK**

7  **       OF PERSONAL JURISDICTION SHOULD BE DENIED**

8       The parties agree that the Court may consider evidence by affidavit to determine if "mini-

9  mum contacts" exist between the Defendants and the forum state. DM PJ 1. Defendants fail to

10 note, however, that "uncontroverted allegations in the complaint must be taken as true," and

11 "[c]onflicts between parties over statements contained in affidavits must be resolved in the plain-

12 tiff's favor." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

13      Based on the facts as alleged in the Complaint and set forth in the Hempel and Seifert

14 Declarations, this Court has specific personal jurisdiction over each of the Defendants. The alle-

15 gations arise out of, and relate to, Cydan's, Vtesse's, and Sucampo's purposeful contacts with

16 Nevada. *See Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014). Moreover, because Cydan was

17 Vtesse's promoter, and Vtesse knowingly benefited from Cydan's contracts and torts, Cydan's

18 jurisdictional contacts are imputed to Vtesse. *See, e.g., Rees v. Mosaic Techs., Inc.*, 742 F.2d 765,

19 768-69 (3d Cir. 1984).

20      The Court also has specific jurisdiction over Cydan II and Sucampo because they are suc-

21 cessors, agents, and/or alter egos to Cydan and Vtesse. *See, e.g., Harris Rutsky & Co. Ins. Serv. v.*

22 *Bell & Clements*, 328 F. 3d 1122 (9th Cir. 2002); *Fairbanks Gold Mining, Inc. v. D & D Tire, Inc.*,

23 No. 3:10-cv-00492-ECR-WGC, 2011 U.S. Dist. LEXIS 110244, at *10-12 (D. Nev. Sept. 23,

24 2011). Notably, if personal jurisdiction exists in connection with one claim, but not others, the

25 district court may exercise pendent personal jurisdiction over any remaining claims that arise out

26 of the same "common nucleus of operative facts." *Action Embroidery Corp. v. Atl. Embroidery,*

27 *Inc.*, 368 F.3d 1174, 1180-81 (9th Cir. 2004).

28                                        8

1
2

### A.   Defendants Are Subject to Specific Jurisdiction Based on Their Purposeful Conduct

3     "The Ninth Circuit has established a three-prong test for analyzing an assertion of specific

4  personal jurisdiction." *Casun Invest, A.G. v. Ponder*, No. 2:16-CV-2925 JCM (GWF), 2018 U.S.

5  Dist. LEXIS 25564, at *4-5 (D. Nev. Feb. 16, 2018) (citing *Schwarzenegger*, 374 F.3d at 802):

6  "(1) The non-resident defendant must ***purposefully direct*** his activities or consummate some trans-

7  action with the forum or resident thereof; or perform some act by which he ***purposefully avails***

8  himself of the privilege of conducting activities in the forum, thereby invoking the benefits and

9  protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's

10  forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and sub-

11  stantial justice, i.e., it must be reasonable."[2] *Casun Invest, A.G.*, 2018 U.S. Dist. LEXIS 25564 at

12  *4-5 (emphasis supplied). "Purposeful direction" and "purposeful availment" are distinct analyses:

13  "[p]urposeful availment is for suits sounding in contract, whereas purposeful direction is for suits

14  sounding in tort." *Id.*, at *23.

15
16

### 1.   Defendants Purposefully Directed Their Activities At Nevada

17     In regard to tort claims, "[t]o purposefully direct activities at a forum state, a defendant

18  must (1) commit an intentional act, (2) expressly aimed at the forum, (3) that causes foreseeable

19  harm in the forum." *Alley Cat, Inc. v. Duncan*, No. 2:16-cv-02745-JAD-CWH, 2017 U.S. Dist.

20  LEXIS 164079, at *12 (D. Nev. Sep. 28, 2017).

21     The fundamental question is "whether the defendant's conduct connects him to the forum

22  in a meaningful way." *Id.* Generally, when a party "contacts" a forum resident and sends "solici-

23  tations" to the resident for purposes of developing a business relationship, or creates "continuing

24

25  ───────────────
  [2] Acknowledging these elements, DM PJ 8, Defendants do not argue—and thus have waived—

26  any issue concerning the second and third prongs of the analysis. *See Cruz v. Durbin*, No. 2:11-
  cv-342-LDG-VCF, 2014 U.S. Dist. LEXIS 150328, at *24 (D. Nev. Oct. 20, 2014) ("[A]rguments

27  raised for the first time in reply are waived.") (citing cases).

28

obligations" with a forum resident, he directs his contact at the forum—even if he never enters the forum. *See, e.g., Levinson v. Second Judicial Dist. Court*, 103 Nev. 404, 407 (1987) (ongoing obligations); *Haake v. Strudwick*, No. 1:14-cv-00212-CWD, 2014 U.S. Dist. LEXIS 168749, at *19 (D. Idaho Dec. 1, 2014) (contact and solicitations). Ironically, Defendants cite and rely upon *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 191 F. Supp. 3d 790, 800 (N.D. Ill. 2016) (cited in DM PJ 10), where the court exercised specific jurisdiction over a non-forum defendant who never entered the forum because the defendant "initiated a dialogue with [the plaintiff], sought out its services, and began developing a relationship with it" before turning around and using the plaintiff's trade secrets. *Id.* That is precisely what happened here.

Cydan targeted Hugh Hempel—identified on his LinkedIn profile as a Nevada resident—with online messages. Cydan solicited a business relationship, premised on Cydan's interest in a joint venture. Cydan knew the Hempels intended to form Solution Therapeutics, a C-corp based in Reno, Nevada. Cydan requested and obtained access to the cache of Protected Materials the Hempels had compiled and maintained in Nevada. Cydan then misappropriated those materials, and violated its fiduciary relationship with the Hempels by diverting the business opportunity to Vtesse. This is more than sufficient to find purposeful conduct aimed at the forum. *See, e.g., Levinson*, 103 Nev. at 407; *Haake*, 2014 U.S. Dist. LEXIS 168749 at *19; *IPOX Schuster*, 191 F. Supp. 3d at 800.

Before turning to specific application of the purposeful direction elements, it bears repeating that Defendants are each directly liable for misappropriation. As detailed in Plaintiffs' Opposition to Defendants' Consolidated Motion to Dismiss for Failure to State a Claim and Lack of Subject Matter Jurisdiction ("Pls.' Opp'n FSC"), Cydan, Vtesse, and Sucampo are all liable for misappropriation, and thus are subject to the same jurisdictional analysis, because they knew, or had reason to know, that they were benefitting from trade secrets misappropriated from the Hempels. Pls.' Opp'n FSC Argument II.D.1; *see also New Eng. Life Ins. Co. v. Lee*, No. 2:14-CV-1797 JCM (NJK), 2015 U.S. Dist. LEXIS 39462, at *20 (D. Nev. Mar. 27, 2015); *see also PMC, Inc. v. Kadisha*, 93 Cal. Rptr. 2d 663, 669-79 (Cal. Ct. App. 2000) (holding investors liable for

1  misappropriation by corporation even though misappropriation began before their investment).

2            a.      **The Elements of Purposeful Direction Are Satisfied**

3        *First*, Defendants committed an intentional act. "[I]f a nonresident defendant intentionally

4  harms an in-forum resident, then the first prong of the court's jurisdictional inquiry is satisfied."

5  *Mayweather v. Wine Bistro*, No. 2:13-cv-210-JAD-VCF, 2014 U.S. Dist. LEXIS 168720, at *9

6  (D. Nev. Nov. 17, 2014). It is well-established that allegations of misappropriation and use of

7  confidential material, theft of trade secrets, breach of fiduciary duties, or other specific acts di-

8  rected at forum residents satisfy the intentional conduct requirement. *See, e.g., SVI, Inc. v. Supreme*

9  *Corp.*, No. 2:16-cv-01098-JAD-NJK, 2017 U.S. Dist. LEXIS 81983, at *11 (D. Nev. May 30,

10  2017) (alleged misappropriation of trade secrets satisfy intentional act); *T-Mobile USA, Inc. v.*

11  *Huawei Device USA, Inc.*, 115 F. Supp. 3d 1184, 1203 (W.D. Wash. 2015) (alleged misappropri-

12  ation of technology for use in creating competitive product); *Advanced Vision Sols., Inc. v. Leh-*

13  *man*, No. 2:14-cv-01597-APG-NJK, 2015 U.S. Dist. LEXIS 9035, at *9 (D. Nev. Jan. 26, 2015)

14  (allegations that fiduciary duties to Nevada resident were breached, property stolen, and/or oppor-

15  tunities diverted). Here, Cydan, Vtesse, and Sucampo intentionally harmed the Hempels by mis-

16  appropriating their trade secrets. Pls.' Opp'n FSC Argument II. Simultaneously, Cydan breached

17  its fiduciary duties to the Hempels in connection with their joint venture by diverting the commer-

18  cial opportunity to Vtesse. Pls.' Opp'n FSC Argument III.B.1. And Vtesse and Sucampo unjustly

19  enriched by Cydan's intentional breach of those fiduciary duties. Pls.' Opp'n FSC Argument

20  III.B.2.

21        *Second*, Defendants "expressly aimed" their conduct at the forum. "Express aiming exists

22  where the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom

23  the defendant knows to be a resident of the forum state." *MYSFYT, Inc. v. Lum*, No. 4:16-cv-03813-

24  KAW, 2016 U.S. Dist. LEXIS 164592, at *7 (N.D. Cal. Nov. 29, 2016) (citing *CollegeSource,*

25  *Inc. v. Academyone, Inc.*, 653 F.3d 1066, 1077 (9th Cir. 2011)). Defendants knew that the Hempels

26  were located in Nevada. It was indicated on Hugh's LinkedIn profile, in the Business Plan that

27  Hugh shared with Cydan, on the Confidentiality Agreement, and in emails exchanged between the

28

        11

1    parties. Vtesse even visited the Hempels *in their home* to lull the Hempels into complacency. Thus,
2    Defendants' misappropriation and use of Protected Material was expressly aimed at the Hempels
3    in Nevada: defendants targeted their conduct at the Hempels, knowing them to be in Nevada.

4         *Third*, Defendants could have foreseen that the effects of their conduct would be felt in
5    Nevada. *See Alley Cat, Inc.*, 2017 U.S. Dist. LEXIS 164079 at \*12. There can be no serious dispute
6    that the harm associated with Defendants' misappropriation of confidential material, theft of trade
7    secrets, breach of fiduciary duties, conversion, and other tortious conduct would foreseeably be
8    felt by the Hempels in Nevada. Cydan and Vtesse were undeniably aware that damage from their
9    conduct would be felt by the Hempels in their home state, which was the business center of their
10    research and development activities. Each of the three prongs is satisfied, and the Court should
11    find "purposeful direction" by Defendants.

12         **b.    Defendants' Authorities Are Readily Distinguishable**

13         Defendants' authorities are not to the contrary, *see* DM PJ 8-9, and are all distinguished on
14    the facts: In *Morrill v. Scott Financial Corp.*, 873 F.3d 1136 (9th Cir. 2017), the plaintiffs *brought*
15    *suit in Arizona*, based on the defendants' third-party subpoenas issued in Arizona, incidental to
16    extensive *Nevada litigation* involving the parties. The court held that Arizona was not a proper
17    forum, because the alleged tortious acts "arose out of and were component parts of the litigation
18    in Nevada," and the "primary effects of [d]efendants' actions, including the alleged harm, were
19    tied directly to the litigation in Nevada." *Id.* at 1144. Under the unusual facts of that case, the court
20    rejected the notion that "incidental harm" from the issuance of subpoenas in Arizona could support
21    a finding that Arizona had been "expressly targeted" by the defendants' conduct, when the sub-
22    poenas arose out of a Nevada lawsuit. *Id.* Here, however, Cydan and Vtesse *primarily* targeted the
23    Hempels—and their Protected Material—*in Nevada*. The targeting of Nevada residents was not
24    "incidental," *i.e.*, tangentially related, to a separate relationship between the parties primarily based
25    in another jurisdiction. *Morrill* is simply not analogous.

26         Similarly, *Walden v. Fiore*, 134 S. Ct. 1115 (2014), is inapposite. There, the non-resident
27    defendant incidentally came into contact with a Nevada resident in Georgia, while the Nevada

28

1  resident was traveling from Puerto Rico to Nevada. The court held suit could not be maintained in

2  Nevada. The defendant in *Walden*, however, did not intentionally solicit a relationship or develop

3  ongoing obligations to the plaintiff, knowing that the plaintiff was a Nevada resident. In *Walden*,

4  the *only* link between the defendant and the forum was the residency of the plaintiff. In contrast,

5  here, Cydan directly solicited a relationship with the Hempels knowing they were situated in Ne-

6  vada and concerning an asset developed in Nevada, negotiated and executed the Confidentiality

7  Agreement with the Hempels that designated Nevada law to the parties' relationship, had a

8  months-long relationship with the Hempels regarding a joint venture intended to have lasted years,

9  misappropriated the Hempels' Business Plan, knowing the Hempels intended to form Solution

10  Therapeutics in Nevada, and misappropriated the Protected Material knowing it had been devel-

11  oped and maintained in Nevada. This is far from incidental or arbitrary contact with a Nevada

12  resident in a far-flung jurisdiction, the likes of which was at issue in *Walden*.

13      *Axiom Foods, Inc. v. Acerchem International, Inc.*, 874 F.3d 1064 (9th Cir. 2017), is no

14  more availing: in that case, involving a newsletter alleged to infringe on copyright, the court found

15  Defendant's conduct was insufficient to establish specific jurisdiction in California, because De-

16  fendant was located in the United Kingdom, and the overwhelming majority of the alleged in-

17  fringement was directed at "Western Europe." *Id.* at 1067 ("No more than ten recipients" in Cali-

18  fornia). Here, by contrast, the claim arises out of one-on-one dealings, and the alleged tortious

19  conduct was directed *only* at Nevada and at Nevada parties.

20      *Millenium Drilling Co. v. Beverly House-Meyers Revocable Trust*, No. 2:12-cv-00462-

21  MMD-CWH, 2014 U.S. Dist. LEXIS 24697 (D. Nev. Feb. 25, 2014) (DM PJ 8-9), is also inappo-

22  site: the dismissed defendant had no contact with forum residents (other than to send a single,

23  courtesy copy of a document prepared for clients in Massachusetts or Connecticut). Here, Cydan

24  and Vtesse dealt directly with the Hempels in Nevada.

25      Finally, *Picot v. Weston* (*see* DM PJ 8) concerns a contract claim—not tort claims—and

26  thus does not apply "purposeful direction" analysis. 780 F.3d 1206, 1211 (9th Cir. 2015).

27      In sum, Defendants' purposefully directed their activities at Nevada. They solicited Nevada

28                                        13

1   residents to form an on-going relationship, whereby Defendants could obtain access to Protect
2   Material developed in Nevada. Defendants fostered a joint venture related to a company that the
3   parties intended to form in Nevada, and then misappropriated the Protected Material, diverted the
4   opportunity, and intending to cause an injury in Nevada. This Court has specific jurisdiction over
5   Cydan and Vtesse.

6             **2.**    **Defendants Purposefully Availed Themselves of Nevada**

7         The Complaint also states claims for breach of express and implied contracts against
8   Cydan. Compl. ¶¶ 96-103, 142; *see also* Pls.' Opp'n FSC Argument I.[3] To determine whether
9   specific jurisdiction exists in a contract case, the court considers whether the defendant "purpose-
10  fully availed himself of the privilege of conducting activities within the forum state that give rise
11  to plaintiff's claims." *Casun Invest,* 2018 U.S. Dist. LEXIS 25564, at *8 (citing *Schwarzenegger*,
12  374 F.3d 797).

13        Fundamentally, "[w]hen parties reach out beyond one state and create continuing relation-
14  ships and obligations with citizens of another state," they are "subject to regulation and sanctions
15  in the other State for the consequences of their activities." *Casun Invest, A.G.*, 2018 U.S. Dist.
16  LEXIS 25564 at *8 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)). To make
17  a determination of "purposeful availment," the court considers "prior negotiations and contem-
18  plated future consequences, as well as the parties' actual course of dealing." *Alley Cat, Inc.*, 2017
19  U.S. Dist. LEXIS 164079, at *10-11; *see also Burger King*, 471 U.S. at 478; *Hoag v. Sweetwater*
20  *Int'l*, 857 F. Supp. 1420, 1426 (D. Nev. 1994).

21        More specifically, "consummat[ing] a transaction with residents of Nevada" is a sufficient
22  basis upon which to assert specific jurisdiction. *Albertazzi v. Albertazzi*, No. 3:17-cv-00703-
23  MMD-WGC, 2018 U.S. Dist. LEXIS 7415, at *9 (D. Nev. Jan. 17, 2018) (finding purposeful
24

25  [3] The contracts are enforceable irrespective of whether the Hempels formed Solution Therapeutics.
26  *See* Pls.' Opp'n FSC Argument I.A.1; *see also Jacobson v. Stern*, 96 Nev. 56, 61 (1980); *T St.*
    *Dev., L.L.C. v. Dereje*, Civ. Action No. 05-524 (GK), 2005 U.S. Dist. LEXIS 38713, *14-15
27  (D.D.C. Dec. 19, 2005).

28                                14

1   availment based on "execution of [a] Note and Addendum"). A confidentiality agreement that
2   "form[s] the basis of an extended relationship between the parties" can be sufficient as the basis
3   for exercising jurisdiction. *Andritz Inc. v. M&G Finanziaria S.r.l.*, No. 1:15-CV-00796-RWS,
4   2016 U.S. Dist. LEXIS 36644, at *33 (N.D. Ga. Mar. 22, 2016). And a choice of law provision in
5   favor of the forum "reinforce[s a defendants'] deliberate affiliation with the forum State and the
6   reasonable foreseeability of possible litigation there." *Burger King*, 471 U.S. at 482. Finally, a
7   party cannot avoid jurisdiction merely by stating that it never physically entered the state, because
8   "a substantial amount of business is transacted solely by mail and wire communications across
9   state lines, thus obviating the need for physical presence within a State in which business is con-
10  ducted." *Ognibene v. Lagori*, No. 2:12-cv-01307-RCJ-GWF, 2012 U.S. Dist. LEXIS 151497, at
11  *15 (D. Nev. Oct. 19, 2012) (quoting *Burger King*, 471 U.S. at 476).

12          Cydan purposefully availed itself of doing business in Nevada. The relationship between
13  Cydan and the Hempels was intentionally initiated by Cydan, which solicited a business relation-
14  ship with the Hempels for the purposes of investing in an asset developed in Nevada by Nevada
15  residents. Cydan reached out to Hugh in Nevada and enticed him to visit Cydan from Nevada,
16  knowing the effects of its efforts would be felt in Nevada (and only Nevada). In advance of that
17  meeting, the Hempels presented Cydan with the Business Plan, which established an implied con-
18  tract relating to Solution Therapeutics, the proposed Nevada C-Corp. The parties then codified
19  their ongoing, confidential relationship by the Confidentiality Agreement, which was governed by
20  Nevada law. Thereafter, Cydan and the Hempels participated in the mutual exchange of infor-
21  mation to and from Nevada, in furtherance of the Nevada-based venture. Thus, Cydan purposefully
22  availed itself of the laws of Nevada. *See Levinson*, 103 Nev. at 407.

23          Vtesse is subject to personal jurisdiction for the same reasons. Vtesse ratified Cydan's
24  Confidentiality Agreement and implied contract regarding the Business Plan by accepting the ben-
25  efits. *See Chartrand v. Barney's Club, Inc.*, 380 F.2d 97, 100-102 (9th Cir. 1967); *Jacobson*, 96
26  Nev. at 60-61 (ratification by subsequently formed company's acceptance of benefits). Thus,
27  Vtesse assumed Cydan's jurisdictional contacts. *See Rees*, 742 F.2d at 768-69).

28
                                              15

1    Cydan's authorities are not to the contrary. Cydan contends that the "most analogous" de-
2 cision is an Eighth Circuit opinion, *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 821-25
3 (8th Cir. 2014), in which the plaintiff asserted breach of a *non-compete* covenant. In that case,
4 however, (i) the plaintiff contended that a "choice-of-law provision in the Agreement [was] suffi-
5 cient to establish personal jurisdiction," (ii) there was no competition—*i.e.*, no breach of the agree-
6 ment—alleged to have taken place within the jurisdiction, and (iii) crucially, there was no contem-
7 plation by the parties of any "consequences specifically in [the forum]." *Id.* In *Fastpath*, the Eighth
8 Circuit contrasted *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 519 (8th Cir. 2010),
9 in which there were "meaningful events in the parties' business relationship" that took place within
10 the forum. *See Fastpath, Inc.*, 760 F.3d at 821.

11    This case is unlike *Fastpath* in every way. The Hempels do not contend that the choice of
12 law provision is sufficient to establish jurisdiction, but rather that the Nevada choice of law provi-
13 sion serves to reinforce the other pertinent considerations, suggesting purposeful availment by
14 Cydan. *See Burger King*, 471 U.S. at 482. Whereas *Fastpath* dealt with an alleged breach of a *non-*
15 *compete* agreement, and there was no allegation of competition specifically within the forum, this
16 case involves allegations of breach of a confidentiality agreement, and misappropriation of confi-
17 dential information and trade secrets created and situated in Nevada. Moreover, unlike in
18 *Fastpath*, the parties here contemplated consequences within the forum: sharing confidential in-
19 formation and trade secrets situated in Nevada, in connection with a Business Plan and Confiden-
20 tiality Agreement that related to a proposed Nevada-based C-Corp. *See* Business Plan 4. And fi-
21 nally, meaningful events took place in Nevada: the Hempels created their confidential information
22 and trade secrets in Nevada, they disclosed information from Nevada for the purpose of Cydan's
23 evaluation of an investment in a Nevada corporation, and Cydan misappropriated that Nevada-
24 based material.[4]

25

26 ---
[4] Defendants rely primarily on *Fastpath*, but their other authorities fare no better. *See* DM PJ 6-8.
27 In *Picot*, *plaintiff's* "fulfill[ment of] his obligations under the agreement by seeking out investors
and buyers in California" did not create specific jurisdiction over a co-venturer *defendant* located

28                                      16

1    In sum, Cydan and Vtesse are being called to account in Nevada because they were doing
2    business in Nevada with Nevada residents concerning a proposed Nevada investment and acting
3    under Nevada law. They purposefully availed themselves of Nevada. Nothing about their contacts
4    with the state were "random," "fortuitous," or "attenuated." *Burger King Corp.*, 471 U.S. at 480.

5         **B.    Cydan's and Vtesse's Contacts**
6              **Are Imputed to Cydan II and Sucampo**

7         As set forth below, Cydan II and Sucampo should also be deemed subject to the Court's
8    jurisdiction under principles of successor liability, agency, and alter ego status. If there is any
9    question as to whether the Hempels have adequately established the foundation for such determi-
10   nation based on the facts adduced to date, the proper course is to proceed with jurisdictional dis-
11   covery so that the facts may be determined. *See Fairbanks*, 2011 U.S. Dist. LEXIS 110244, at *12
12   (noting abuse of discretion to deny jurisdictional discovery for purposes of determining whether
13   contacts should be imputed) (citing *Harris Rutsky*, 328 F.3d at 1135; *Chan v. So'y Expeditions,*
14   *Inc.*, 39 F.3d 1398, 1406 (9th Cir. 1994); *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d
15   406, 430 n.24 (9th Cir. 1977).

16        **1.    Sucampo and Cydan II are Successors in Interest**

17        The contacts of a business entity "may be imputed to [a successor in interest] if the law of
18   the forum, Nevada, would hold [the successor] liable for the actions of their alleged predecessor."
19   *Fairbanks*, 2011 U.S. Dist. LEXIS 110244 at *10-11. Under Nevada law, a successor is
20

21   in Michigan because the defendant did not seek out investors or buyers in California. 780 F.3d at
22   1213. Plainly, the *Picot* opinion would have been different if—as here—the defendant had specif-
     ically sought out partners in the forum. Defendants cite *Wellpartner, Inc. v. DeLeon Pharmacy,*
23   *Inc.*, No. 3:15-cv-01577, 2015 U.S. Dist. LEXIS 158533, at *17 (D. Or. Nov. 24, 2015), for the
     principle that "ordinary use of the mail, telephone, or other communications simply do not qualify
24   as purposeful activity." But it is not the "ordinary use" of the phone that renders Cydan subject to
     the Court's jurisdiction—it is the solicitation and development of an on-going, confidential busi-
25   ness relationship predicated upon doing business in Nevada. And in *Andes Industries Inc. v. Cheng*
     *Sun Lan*, No. 2:14-cv-00400, 2015 Dist. LEXIS 38693 (D. Nev. Mar. 25, 2015), the only connec-
26   tion to the forum was plaintiff's incorporation in Nevada: all parties were based in other jurisdic-
27   tions, and "the parties' actual course of dealing did not involve Nevada." *Id.*, at *10.

28                                      17

1  | responsible for the liabilities of its predecessor when (1) the purchaser "expressly or impliedly
2  | agreed to assume such debts"; (2) the transaction "was really a consolidation or a merger"; (3) the
3  | purchasing corporation is "merely a continuation of the selling corporation"; or (4) "where the
4  | transaction was fraudulently made in order to escape liability for such debts." *Vill. Builders 96,*
5  | *Ltd. P'ship v. U.S. Labs., Inc.,* 121 Nev. 261, 268 (2005) (citation omitted).

6  |     More specifically, in determining whether a *de facto* merger has occurred, the courts con-
7  | sider various factors, including "(1) whether there has been a continuation of the enterprise; (2)
8  | continuity of shareholders; (3) whether the seller corporation ceased its ordinary business opera-
9  | tions; and (4) whether the purchaser assumed the seller's obligations. *Id.* at 269. No single factor
10 | is "either necessary nor sufficient to establish a *de facto* merger"; the facts are considered, with
11 | the objective of "properly balanc[ing] the successor corporation's rights to be free from liabilities
12 | incurred by its predecessor, with the important interest involved in ensuring that ongoing busi-
13 | nesses are not able to avoid liability by transferring their assets to another corporation." *Id.*

14 |     The decision in *Aventine-Tramonti Homeowners Association v. Vanguard Piping System,*
15 | Case No. A555328, 2013 Nev. Dist. LEXIS 902 (Nev. 8th Jud. Dist. Ct. May 15, 2013), is instruc-
16 | tive. Applying *Village Builders,* the court found successor liability where, after a 100% stock pur-
17 | chase, the acquirer asserted continuous control over the target's business operations and subse-
18 | quently transferred the target's assets to itself. *Id.,* at *9-10. Under the circumstances, the court
19 | held that the acquirer had expressly or impliedly agreed to assume the debts and obligations of the
20 | target. *Id.* Furthermore, because the acquirer simply took over the business operations of the target,
21 | the "mere continuation" exception applied. *Id.,* at *10.

22 |     As in *Aventine,* Sucampo plainly meets the criteria as a successor to Vtesse. After acquiring
23 | 100% of Vtesse's stock, Sucampo hired all of Vtesse's employees, fired Vtesse's chief executive
24 | officer (but hired him as a consultant to Sucampo) and subsumed Vtesse's assets and its employees
25 | into its operations, moving Vtesse from its offices in Gaithersburg, Maryland to Sucampo's head-
26 | quarters in Rockville, Maryland. Compl. ¶¶ 17-18 & 93; *see also* Seifert Decl. Ex. 3. Thereafter,
27 | Sucampo touted VTS-270 as its own asset in public filings and public statements and referred to

28 |

1   Vtesse as VTS-270's "former owner." Seifert Decl. Ex. 4 at 2; *see also id*. at 1 (referring to VTS-

2   270 as part of the Sucampo "portfolio"). Thus, Sucampo's acquisition of Vtesse constituted a *de*

3   *facto* merger, and/or Sucampo was a mere continuation of Vtesse's operations. By implication—

4   if not expressly—Sucampo agreed to assume the liabilities, and jurisdictional contacts, of Vtesse.

5          The *Village Builders* factors also confirm that the conversion of Cydan to Cydan II should

6   be continued a *de facto* merger or continuation of operations. One month after orchestrating the

7   sale of Vtesse to Sucampo for $200 million, Cydan formed Cydan II on May 10, 2017. Cydan II

8   has the same investors as Cydan,[5] and was created for the specific purpose of "continuing the

9   mission of Cydan, Inc." Seifert. Decl. Ex. 5. Thus, Cydan II was expressly formed as a "continu-

10  ation of the enterprise" with Cydan and with a "continuity of shareholders." *Vill. Builders 96, Ltd.*,

11  121 Nev. at 268. Following the formation of Cydan II, the Cydan website converted references to

12  "Cydan Development" into references to "Cydan II." *Compare* Seifert Decl. Ex. 7 (Feb. 2017

13  snapshot of cydanco.com, *see* footer) *with* Ex. 8 (Apr. 2018 snapshot *same*). Cydan appears, ef-

14  fectively, to have ceased its operations following the formation of Cydan II.

15         Finally, details concerning the relationship between Cydan and Cydan II are exclusively in

16  Defendants' possession. Thus, Discovery is warranted to determine, for example, the extent to

17  which Cydan II assumed liabilities and obligations for Cydan; the extent to which Cydan II bought

18  out the interests of Cydan; and the extent to which Cydan II assumed Cydan's employees and

19  business operations. In any event, there is a *prima facie* basis upon which to find the relationship

20  between these two created successor liability.

21                    **2.    Sucampo and Cydan II are**

22                    **Alter Egos or Agents of Cydan and Vtesse**

23         The contacts of a subsidiary may be imputed to its parent "(1) where the subsidiary is the

24  parent's alter ego, or (2) where the subsidiary is the parent's agent." *Fairbanks*, 2011 U.S. Dist.

25  LEXIS 110244, at *10; *Aventine*-Tramonti, 2013 Nev. Dist. LEXIS 902, at *11-12. To prove

26

27  [5] Cydan and Cydan II have only one different investor. *See* Seifert Decl. Ex. 5 at 1-3.

28                                                    19

1   personal jurisdiction on the basis of alter ego status, a plaintiff must ultimately show "(1) that there
2   is such unity of interest and ownership that the separate personalities [of the two entities] no longer
3   exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice."
4   *Geanacopulos v. Narconon Fresh Start*, 39 F. Supp. 3d 1127, 1133 (D. Nev. 2014) (quoting *Doe*
5   *v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001)). The determination is a fact-dependent, multi-
6   factor analysis, that is sharpened with the benefit of discovery. *See Chunghwa Telecom Glob. v.*
7   *Medcom*, No. 5:13-cv-02104-HRL, 2016 U.S. Dist. LEXIS 138695, at *8-9 (N.D. Cal. Oct. 5,
8   2016). For the reasons stated above, discovery is warranted to elicit additional facts bearing on the
9   extent to which Sucampo and Cydan II have acted as alter egos or agents of Vtesse and Cydan,
10  respectively. *See, e.g.*, *Geanacopulos*, 39 F. Supp. 3d at 1133.

11  ## II.    DEFENDANTS' MOTION TO TRANSFER SHOULD BE DENIED

12          Venue is proper in Nevada and Defendants' motion to transfer this action to Maryland
13  should be denied. *See* DM PJ 11-12. "[P]laintiff's choice of forum is normally given substantial
14  deference if the plaintiff, as here, is a resident of the district in which the action is brought."
15  *Banerjee v. Cont'l Incorporated, Inc.*, 2:16-CV-669 JCM (VCF), 2016 U.S. Dist. LEXIS 141235,
16  (D. Nev. Oct. 11, 2016). In such cases, Defendant must make a "strong showing of inconvenience
17  to warrant upsetting the plaintiffs' choice of forum." *Id.* at *9. Defendants have failed to do so.

18          Defendants cite eight factors regarding motions to transfer: (1) the location where the rel-
19  evant agreements were negotiated and executed; (2) the state that is most familiar with governing
20  law; (3) plaintiff's choice of forum; (4) the respective parties' contacts with the forum; (5) the
21  contacts relating to the plaintiff's cause of action in the chosen forum; (6) the differences in the
22  costs of litigation in the two forums; (7) availability of compulsory process to compel attendance
23  of unwilling non-party witnesses; and (8) ease of access to sources of proof. *See* DM PJ 11 (citing
24  *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000)). "These factors are non-ex-
25  haustive and the Court ultimately has discretion in deciding which factors to consider and whether
26  they weigh in favor of transfer." *Vuori v. Grasshopper Capital LLC*, No. 17-cv-06362-JCS, 2018
27  U.S. Dist. LEXIS 29731, at *61 (N.D. Cal. Feb. 22, 2018). Here, the balance of those factors
28

strongly favors keeping this action in Nevada rather than overriding the Hempels' choice of forum in favor of Defendants' preference to be in Maryland.

As an initial matter, Defendants concede that the first three factors do not weigh in favor of transferring this action to Maryland. DM PJ 12. The fourth and fifth factors also favor Nevada: the Hempels reside in Nevada, the Hempels' developed and maintained their Protected Material in Nevada, the Business Plan related to a proposed corporation to be formed in Nevada, and the Confidentiality Agreement was prepared in Nevada and is expressly governed by Nevada law. And, critically, the Hempels' injury was felt in Nevada. *Cf. SVI*, 2017 U.S. Dist. LEXIS 81983, at *13-14 (denying motion to dismiss for improper venue in Nevada because misappropriated trade secrets were developed in Nevada).

With respect to the remaining three factors, Defendants do not make a "strong showing of inconvenience" on any of them. Regarding the sixth, Defendants have retained one of the most expensive law firms in the country to defend their $200 million windfall: they can hardly claim that litigation costs are a significant factor, and have not made any showing that Maryland would be significantly less expensive. Regarding the seventh, the primary witnesses at trial will be the parties and their agents. Moreover, compulsory process discovery is available by subpoenas issued from other District courts, and discovered testimony may be used at trial. Thus, there is no "strong showing of inconvenience" based on the availability of compulsory process. Finally, regarding the eighth factor, litigating in Maryland would not give the parties easier access to sources of proof. The evidence is likely to be found in in Nevada, where the Hempels reside, in California, where the Hempels' primary researchers and physicians are located, *see* Compl. ¶¶ 33-36, in Massachusetts, where Cydan reviewed the Hempels' Protected Material before misappropriating that business opportunity for Vtesse, *id.* ¶ 15, and at universities and hospitals around the country, where the NIH-affiliated researchers conducted their clinical trials, *id.* ¶¶ 51 (St. Louis, Missouri) & 78 (Chicago, Illinois). Moreover, discovery is likely to be almost entirely electronic. Maryland offers the parties no benefits.

As Magistrate Cooke noted during the parties' initial conference, out-of-forum defendants

21

1    now routinely make motions to transfer and motions to dismiss in virtually every case. Surely

2    Defendants would prefer to be in their local court. But the Hempels are due "substantial deference"

3    for their choice to proceed in the District of their residence, which Defendants targeted with their

4    improper conduct. Defendants have made no "strong showing of inconvenience" required to over-

5    come the presumption that the case will proceed here. *Banerjee*, 2016 U.S. Dist. LEXIS 141235

6    at *9. The motion to transfer should be denied.

7                                        **CONCLUSION**

8            For the foregoing reasons, Defendants' motions to dismiss for lack of personal jurisdiction

9    and to transfer venue should be denied.

10

11   DATED: April 23, 2018

                                         THE O'MARA LAW FIRM, P.C.
12

13                                           _____*/s/ David C. O'Mara*_____
                                         DAVID C. O'MARA
14

                                         JOSHUA L. SEIFERT PLLC
15                                       Joshua L. Seifert, Esq.
                                         *Pro Hac Vice*
16                                       jseifert@seifertpllc.com
                                         175 Varick Street
17                                       New York, NY 10014
                                         (646) 823-9786
18

19                                       SLARSKEY LLC
                                         David Slarskey, Esq.
20                                       *Pro Hac Vice*
                                         dslarskey@slarskey.com
21                                       800 Third Avenue, 18th Floor
                                         New York, NY 10022
22                                       (212) 658-0661

23

24

25

26

27

28
                                         22

1

**CERTIFICATE OF SERVICE**

2       I, Valerie Weis, do hereby certify that I am an employee of The O'Mara Law Firm, P.C., and

3 further certify that the foregoing document was electronically filed and served upon all parties via

4 the Court's Electronic Filing system.

5 DATED:  April 23, 2018

                              /s/ Valerie Weis

6                                 VALERIE WEIS

7 LEWIS ROCA ROTHGERBER CHRISTIE, LLP     WILLIAMS & CONNOLLY, LLP
  E. Leif Reid, Esq.                                   Paul B. Gafney, Esq

8 One East Liberty Street                   Jessica Bodger Rydstrom, Esq.
  Ste 300                                      Benjamin M. Stoll, Esq.

9 Reno, NV 89501                      Amanda J. Cox, Esq.
                                    725 Twelfth Street, N.W.

10                                   Washington, DC 20005
  *Counsel for Defendants*

11                                   *Counsel for Defendants*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28